**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *State v. Mammone,* **Slip Opinion No. 2014-Ohio-1942.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-1942

THE STATE OF OHIO, APPELLEE, *v*. MAMMONE, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *State v. Mammone,* **Slip Opinion No. 2014-Ohio-1942.]**

*Criminal Law—Aggravated murder—Death penalty affirmed.*

(No. 2010-0576—Submitted December 11, 2013—Decided May 14, 2014.)

APPEAL from the Court of Common Pleas of Stark County,

No. 2009-CR-0859.

_____

LANZINGER, J.

{¶ 1} This is an appeal as of right by defendant-appellant, James Mammone III, who has been sentenced to death for the aggravated murders of his former mother-in-law, Margaret Eakin, his five-year-old daughter, Macy, and his three-year-old son, James. For the reasons explained below, we affirm Mammone's convictions and sentence.

**I. CASE HISTORY**

{¶ 2} On June 17, 2009, Mammone was indicted on three counts of aggravated murder (R.C. 2903.01), one with a firearm specification (R.C.

2941.145); two counts of aggravated burglary (R.C. 2911.11(A)), each with a firearm specification; violating a protection order (R.C. 2919.27(A)(1)); and attempted arson (R.C. 2923.02(A) and 2909.03(A)(1)).

{¶ 3} Each aggravated-murder count carried two death specifications. Count One, involving Margaret's murder, included a course-of-conduct specification (R.C. 2929.04(A)(5)) and a specification for committing her murder in the course of an aggravated burglary (R.C. 2929.04(A)(7)). Counts Three and Four charged Mammone with the aggravated murders of Macy and James, and each included a course-of-conduct specification and a child-murder specification (R.C. 2929.04(A)(9)). Mammone pled not guilty to all counts and specifications.

{¶ 4} Before trial, defense counsel filed, among other motions, a motion for a change of venue based on excessive pretrial publicity and a motion in limine to exclude all victim photographs at trial. After a hearing, the trial court denied Mammone's motion to change venue as premature but indicated that the motion could be renewed at a later date. The court held a separate hearing on the motion in limine and denied the motion as premature. The court at a later hearing preliminarily approved the photos that the state planned to introduce as evidence but invited further argument about specific photos at trial.

### A. The State's Evidence

*1. Testimony of Marcia Eakin and Other Witnesses*

{¶ 5} Mammone's trial began on January 11, 2010. The state called Mammone's ex-wife, Marcia Eakin, to testify. Marcia testified about the breakdown of her relationship with Mammone and stated that she first told Mammone in August 2007 that she intended to leave him. On that day, Mammone stayed home from work and refused to let her or their two children, Macy and James IV, leave the family's Canton residence. Mammone broke Marcia's cell phone and took all the house phones. She did not leave him that day.

**{¶ 6}** Marcia and Mammone sought counseling, but she did not feel that the marital relationship improved. She testified that Mammone threatened her, warning that "if I tried to leave he would kill me and the children." Unbeknownst to Mammone, Marcia contacted a lawyer to initiate the process of filing for divorce.

**{¶ 7}** On June 13, 2008, Mammone learned that Marcia was seeking a divorce when he intercepted a call from Marcia's lawyer. According to Marcia, Mammone again threatened to kill her, declaring: "I told you if you tried to leave me I was going to kill you." He told Macy and James on that date that "it was time for mommy to go to her grave." Mammone did not let Marcia or the children out of his sight for the rest of the day.

**{¶ 8}** Marcia explained that she and the children managed to get away from Mammone, and she sought a civil protection order against him. On July 10, 2008, the Stark County Common Pleas Court issued a two-year protection order requiring Mammone to stay more than 500 feet away from Marcia. He was permitted only supervised contact with the children.

**{¶ 9}** Marcia testified that the Mammones' divorce was finalized in April 2009. Under the final divorce decree, Mammone was permitted overnight visitation with the children four times a month and evening visitation twice a week. Marcia explained that Mammone picked up and dropped off the children at the home of her parents, Margaret and Jim Eakin, so that Mammone would not have direct contact with Marcia or know where she lived. During visits, Mammone was permitted to text Marcia about matters pertaining to the children.

**{¶ 10}** Marcia testified that on Sunday, June 7, 2009, Mammone picked up five-year-old Macy and three-year-old James at the Eakins' home for a scheduled overnight visitation. Mammone was driving his green BMW.

**{¶ 11}** Marcia met a friend, Ben Carter, to play tennis and have dinner. At 4:25 p.m., Mammone began to text Marcia. Although the two never spoke that

night, they exchanged dozens of text messages over the next 15 hours, and records of these messages were introduced at trial.

{¶ 12} At first, Mammone sought advice about consoling Macy, who was upset. But he quickly shifted to blaming Marcia for the children's suffering, texting: "How long are we going to let these children that you * * * had to have suffer?" Throughout the evening Mammone repeatedly texted Marcia, accusing her of "ruin[ing] lives" by putting herself first. He admonished her to put her children first and demanded to know what was more important than the kids at that moment. Marcia replied by texting that Mammone should "stop tormenting" the children. No fewer than five times, she offered to have Mammone return the children to her mother's house or asked if she could meet him to pick up the children.

{¶ 13} Mammone advised Marcia in a text that he was "at [the] point of no return" and that he "refuse[d] to let gov restrict my right as a man to fight for the family you promised me." At 9:11 p.m., he warned Marcia that "safe and good do not apply to this night my love." Marcia promptly responded, texting: "Do not hurt them." At 9:35 p.m., she asked him to "[k]eep them safe." Mammone texted:

> You got five minutes to call me back on the phone. I am not fucking around. I have stashed a bunch of pain killers for this nigh[t] * * * i hope u would never let happen. I have put on my wedding band, my fav shirt and I am ready to die for my love tonight. I am high as a kite * * * bring o[n] the hail of bullets if need be.

{¶ 14} At this point, Marcia called 9-1-1. The state played a recording of the call at trial. On the recording, Marcia advised the 9-1-1 operator that her children were in a car with her ex-husband, who had threatened to take "a bunch of

painkillers" and had said that he was "ready to die tonight." While Marcia was on the line with the 9-1-1 operator, the operator attempted to call Mammone, but he would not answer his phone. After speaking to the 9-1-1 operator, Marcia texted Mammone that she would not call him (in accordance with the operator's advice), and again urged him to "keep the kids safe." At 10:18 p.m., Marcia in a text to Mammone asked him to meet her so that she could pick up the kids. Marcia's friend Carter confirmed that he and Marcia then drove around looking for Mammone.

{¶ 15} Marcia testified that she then contacted both Mammone's mother and the wife of Richard Hull, Mammone's friend and former employer. Phone records indicate that Richard Hull began to text Mammone, advising him to calm down and keep the kids safe. Hull's texts suggested that Mammone should drop the kids off with Mammone's mother. Hull testified that he and his father also drove around for a time looking for Mammone but did not find him.

{¶ 16} At 2:00 a.m. on June 8, Mammone sent a text to Marcia, stating "I am not one who accepts divorce. * * * I married you for love and for life * * *." At 2:36 a.m., he wrote, "I am so dead inside without u. The children r painful * * * [r]eminders of what I have lost of myself. This situation is beyond tolerable. So what happens next?" At 2:50 a.m., Mammone reiterated in a text to Marcia that the love of his children was "only a source of pain" without her love.

{¶ 17} Hull testified that around 3:00 a.m., he spoke to Marcia and decided not to go back out looking for Mammone because they were hopeful that everything would be fine. Marcia attempted to end her text conversation with Mammone, writing, "Please[] keep kids safe good night."

{¶ 18} At 5:34 a.m., Mammone texted Marcia: "Last chance. Here it goes."

{¶ 19} One of the Eakins' neighbors, Edward Roth, testified that around 5:30 a.m., he heard gunshots and screaming through his open bedroom window.

Roth said that he saw a goldish-tan colored car leaving the Eakin residence and several minutes later saw the same car returning to the street to sit in the middle of the intersection near the house. Roth called 9-1-1. A law-enforcement officer testified that he and another officer arrived to find Margaret Eakin lying severely injured on the floor of a second-floor bedroom. The officers observed two shell casings and a broken lamp.

{¶ 20} Marcia testified that she heard a car roar up her driveway around 5:40 a.m. From a second-floor bedroom window, she saw Mammone get out of the car and empty a red gasoline container onto Carter's truck, which was parked in the driveway. She called 9-1-1, and a recording of the call was introduced at trial by the state. While Marcia was on the phone, she "heard the glass in my back door breaking in and he was inside my apartment." She did not hear Mammone speak, but she heard something that he had thrown hit the ceiling. He then went back outside and threw things at the windows. Mammone left before two deputy sheriffs arrived. According to the deputies, the back door had been forced open, the screen-door glass was broken, and pieces of the door frame were on the kitchen floor.

{¶ 21} The deputies quickly realized that the incident at Marcia's apartment was linked to the incident at the Eakins' residence, but law-enforcement officers had not yet located Mammone and they did not know whether the children were safe.

{¶ 22} At 6:04 a.m., Mammone left a voice mail on Hull's phone, in which the jury heard Mammone confess to Hull, "I killed the kids." Mammone's voice mail continued:

> I said it when I got locked up fucking 358 days ago that she fucking has to die and unfortunately as fucking sick as it sounds I concluded after a while that she took my family from me and the

fucking way to really get her is to take fucking her mom and her kids from her. I missed her dad by a couple minutes. I drove by the house, he was there, and I fucking circled the block and he must've just pulled out or I'd have fucking popped his fucking ass too.

### 2. Testimony of Officers

{¶ 23} Sergeant Eric Risner testified that he and other officers apprehended Mammone sometime after 7:30 a.m. on June 8, 2009, in the driveway of his residence. They found Macy and James dead in the back seat of Mammone's car, still strapped into their car seats. The children had apparently been stabbed in the throat.

{¶ 24} Officer Randy Weirich testified that he removed two items from Mammone's car at the scene: a bloody knife from the back seat and a firearm from the front seat. The firearm had a live round in the chamber, its hammer was cocked, and the safety was off.

{¶ 25} After the vehicle was towed for processing, Officer Weirich cataloged the rest of the car's contents. The evidence log includes ammunition for a .32-caliber gun; a backpack containing knives, heavy-duty shears, and tongs; an axe handle with nails protruding from holes that had been drilled into it; a baseball bat; a military-style bayonet; Mammone's cell phone and a spare battery; a framed wedding photo of Marcia; and Marcia's dried wedding bouquet. Officer Weirich also removed from the car a switchblade and a pocket knife.

### 3. Mammone's Confession

{¶ 26} Mammone was arrested and transported to police headquarters. Once in custody, he signed a written waiver of his *Miranda* rights and gave a full confession. The state introduced an audio recording of the confession at trial.

**{¶ 27}** In his confession, Mammone explained that he had picked up Macy and James for visitation at about 4:00 p.m. on June 7. He then drove past Marcia's nearby apartment. (Mammone admitted that he was not supposed to know where Marcia lived, but he had learned her new address and occasionally stalked her.) He saw a truck parked in Marcia's driveway, and he recognized it because it had been parked there two weeks earlier. Macy told him that the truck belonged to a boy. Mammone explained that this news "didn't make me very happy obviously." He circled the block, and the truck was gone when he drove by again.

**{¶ 28}** Mammone stated that he suspected that Marcia was on a date, so he went "on the hunt" for her with the children in the back seat. He spent a few hours driving around looking for Marcia, all the while "sending [her] agitating text messages trying to get her attention."

**{¶ 29}** Around 6:30 p.m., Mammone took the children to his place for dinner. As he continued to text Marcia, he was "getting to the point of no return." He figured that he had already violated the protection order, and he had "had enough." He said that he had long hoped that things would improve, but stated that "once I suspected that she might have a guy that she was interested in that was it for me, I can't deal with that. It's just not anything that I'm willing to accept."

**{¶ 30}** According to Mammone, after dinner he loaded the children into a gold 1992 Oldsmobile that he had recently purchased. He stated that he had a Beretta .32-caliber automatic handgun, a gasoline container (which he later stopped to refill), a Scripto lighter, a bag full of butcher-type knives, a bayonet, a baseball bat, and another bat-type weapon he had made by driving nails through a hickory shovel handle or axe handle. He also said that he had approximately a dozen painkillers. He took one pill around 9:00 p.m. to "deaden the pain" if he was shot by police officers later that night.

**{¶ 31}** Mammone stated that he parked at Westminster Church (his and Marcia's "family church") just before 5:45 a.m. He stabbed Macy and James with

8

a butcher knife while they were still strapped in their car seats. Mammone related that he had to stab each child in the throat four or five times, which was more than he had expected would be necessary. When detectives asked why he had stabbed the children rather than shooting them, Mammone offered three reasons: (1) noise, (2) uncertainty about whether his gun was dependable, and (3) a desire to conserve rounds for what might lie ahead.

{¶ 32} Mammone said that after killing Macy and James, he drove to the Eakins' home at approximately 5:45 a.m. He left the children in the back seat of the car and "barged in" through the Eakins' unlocked door carrying his Beretta. Mammone found Margaret in a guestroom and shot her in the chest. The gun jammed before he could fire a second round, so he began to hit Margaret with the gun. He then beat her with a lamp until the lamp began to fall apart. Mammone managed to unjam the gun and shot Margaret in the face at close range. He told police officers that a third bullet may have fallen out of the gun when he was attempting to dislodge the slide.

{¶ 33} Mammone stated that he then drove to Marcia's nearby apartment. The truck that he had seen the previous evening was in the driveway. He poured gasoline on the truck and attempted to light it, but the lighter fell apart in his hands.

{¶ 34} Mammone related that after he was unable to light the fire, he retrieved four weapons from his car: (1) the handgun, which he had to unjam again to prepare to fire, (2) the bayonet, which he put in his front pocket, (3) the baseball bat, and (4) the "bat type of weapon" that he had made. He smashed Marcia's screen-door window and back door with the bat and then entered the apartment. Once inside, Mammone unsuccessfully looked for matches or a lighter. He did not go upstairs because he was concerned that Marcia or "the person that was there to protect her" might have a firearm, and he did not want to be a "sitting duck." Mammone left the apartment and began throwing the baseball bat at a

second-floor window, but he became frustrated. He searched his car for another lighter and, unable to find it, drove away.

{¶ 35} After killing his mother-in-law and breaking into Marcia's apartment, Mammone drove around with the children's bodies for several hours. He had expected that he would want to die after committing these violent acts, but he was surprised to find that he "didn't really feel * * * like dying." He also "didn't feel like getting arrested," so he drove in areas where he did not expect to see police officers and drove the speed limit. He claimed that he then took approximately a dozen pills—which he identified as Valium or painkillers—but not enough to cause an overdose.

{¶ 36} Mammone said that he then drove to the Independence Police Station to turn himself in, but he fell asleep in the station parking lot. When he woke, he contacted a relative who arranged for Mammone to turn himself in at a Canton park. En route to the park, Mammone decided to go by his apartment to switch to his BMW, with the idea of leaving the children in the Oldsmobile so that they would not be part of any scene at the park. But an unmarked police car was waiting for him and he was apprehended.

{¶ 37} Mammone told officers that he had contemplated "doing this" for 22 months, but that he had initially intended to kill Marcia, not Macy and James. He said that he killed his mother-in-law because it was "a major blow to [Marcia] to not have her mother." He indicated that hurting Marcia was one of the motives for killing Macy and James as well, but he also cited his objection to divorce as a reason for their murders. Mammone said that he did not intend to kill Marcia on June 8, but that he did plan to maim her. He had wanted to beat Marcia's uterus area with his homemade weapon (making her unable to conceive children), to break her ankles with the baseball bat (something she feared that she had seen done in a movie), and to cut out her tongue (as punishment for not speaking to

him). Mammone also said that he would have killed the man at Marcia's apartment if he could have.

### 4. Forensic Evidence

{¶ 38} Dr. P.S. Murthy, the Stark County Coroner, performed autopsies on Margaret, Macy, and James on June 9, 2009. He testified that he determined that the cause of death for all three victims was homicide.

{¶ 39} According to Dr. Murthy, Margaret had suffered two fatal gunshot wounds and more than 20 blunt-impact injuries and lacerations, consistent with being struck by the butt of a gun and by a household lamp. One bullet had been fired into Margaret's left upper lip from a distance of about six to eight inches and was recovered from the occipital lobe of her brain. Another bullet pierced Margaret's right upper shoulder, perforated her right lung, and exited through her back.

{¶ 40} Dr. Murthy testified that both children died as a result of stab wounds with exsanguination (massive blood loss). Macy had multiple stab wounds to the neck, while James had a single massive stab wound that went through his neck. Both children's lungs were filled with aspirated blood. Macy's right hand and right leg bore multiple defensive wounds, and James had a defensive wound on his right hand.

{¶ 41} According to a laboratory analyst who testified, multiple bloodstains on Mammone's shirt at the time of his arrest had DNA profiles consistent with Margaret's DNA. In addition, a laboratory analyst identified Mammone's fingerprint on a lighter that officers retrieved from a flowerbed near Marcia's apartment.

{¶ 42} Law-enforcement officers took bodily fluid samples from Mammone on the day of his arrest. According to a laboratory analyst, tests did not reveal any trace of opiates or acetaminophen in Mammone's blood.

## B. The Defense Case

{¶ 43} Mammone did not present a case in defense during the trial phase. Before the trial began, defense counsel advised the court during a bench conference that as a matter of strategy, Mammone had "elected to, in effect, concede the trial phase in this matter," and Mammone himself informed the judge that he instead preferred to focus on the second phase of trial. During a brief opening statement, defense counsel candidly explained to the jury that Mammone did not "contest[] much of the evidence and/or facts with respect to this matter." Mammone's counsel repeated that statement during trial-phase closing arguments, emphasized Mammone's honesty in responding to police officers' questioning, and urged the jury to decide the case based on the law rather than on emotion.

## C. Verdict, Sentencing, and Appeal

{¶ 44} On January 14, 2010, the jury returned guilty verdicts on all counts. After a sentencing hearing, the jury unanimously recommended a sentence of death for each of the three aggravated murders. The trial court accepted the recommendation and imposed three death sentences in open court on January 22, 2010.

{¶ 45} The trial court then sentenced Mammone for his noncapital convictions. The court merged Mammone's convictions for two of the gun specifications and also merged his convictions for violating a civil protection order and aggravated burglary of the Eakins' home. Mammone was sentenced to a total of 27 years of consecutive imprisonment for his noncapital offenses. The trial court filed the R.C. 2929.03(F) sentencing opinion on January 26, 2010.

{¶ 46} Mammone appealed, raising nine propositions of law. We will consider Mammone's propositions as they arose chronologically rather than in the order he presents them.

## II. ANALYSIS

## A. Pretrial Issues

### 1. *Venue and Pretrial Publicity*

{¶ 47} In his first proposition of law, Mammone argues that the trial court's denial of his motion for a change of venue violated his rights to due process and to a fair trial by an impartial jury. *See* the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the U.S. Constitution; Ohio Constitution, Article I, Sections 5 and 16. According to Mammone, Stark County was so saturated with media coverage of his case that we should presume "prejudice from the weight of the adverse publicity" without the need for further inquiry. Alternatively, Mammone argues that we should conduct a review of the complete record and conclude that members of the jury were actually biased against Mammone due to their exposure to the extensive coverage.

### a. Factual and procedural background

{¶ 48} Mammone filed a pretrial motion for a change of venue on October 1, 2009. As an appendix to the motion, Mammone attached copies of articles posted on the *Canton Repository*'s website, CantonRep.com, between June 9 and August 26, 2009, along with comments posted by online readers of the newspaper. He also attached copies of postings that appeared on other websites.

{¶ 49} The trial court held a venue hearing on November 12, 2009. During the hearing, Mammone submitted 11 exhibits, including coverage of his case from various radio, television, and print publications. The materials included a copy of a "confession letter" that had been published in the print version of the *Repository* on August 25, 2009, and posted on its website. The letter, written and sent by Mammone himself, began with the statement that it was mailed it to the newspaper to "set the record straight regarding any questions and misconceptions" about the murders of Margaret, Macy, and James. Mammone argued at the hearing that in

light of these materials, "an attempt to seat a jury would be likely futile," so that the court should presume prejudice and grant his change-of-venue motion.

{¶ 50} The state countered that it would be premature to change venue before conducting voir dire, and the trial court agreed. The court expressed concern about the *Repository*'s publication of Mammone's letter, but observed that "this case has not gotten nearly the type of publicity" that would require the court to grant the motion without even seeking "to review and do a voir dire of prospective jurors." Without a thorough voir dire, the court deemed it impossible to determine whether media exposure was "so pervasive that an impartial jury [would] be impossible to seat." As a result, the court denied Mammone's motion as premature but left the issue open for further consideration "during and after the Voir Dire."

{¶ 51} At the close of the venue hearing, the court advised Mammone, "I would expect you to refile at any time or reargue your motion for a change of venue." Mammone never did so.

{¶ 52} We decline to allow Mammone to benefit from the publicity he created by submitting his own confession to the *Repository*. We conclude that the trial court's denial of Mammone's motion for a change of venue did not violate his rights to due process and to a fair trial by an impartial jury.

*b. Right to a fair and impartial jury*

{¶ 53} "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). In a capital case, jurors must be impartial as to both culpability and punishment. *Morgan v. Illinois*, 504 U.S. 719, 726-728, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). "[W]hen it appears that a fair and impartial trial cannot be held in the court in which the action is pending," Crim.R. 18(B) gives a trial court authority—sua sponte or upon a party's motion— to transfer venue to another jurisdiction. *See* R.C. 2901.12(K); *State v. Conway*,

109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 33. One common argument for a venue change is that pretrial publicity has impaired a jury's ability to be fair and impartial.

{¶ 54} The trial court has a "duty to protect" criminal defendants from "inherently prejudicial publicity" that renders a jury's deliberations unfair. *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). However, "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

{¶ 55} This court has repeatedly stated that "the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality" is "a careful and searching voir dire." *State v. Bayless*, 48 Ohio St.2d 73, 98, 357 N.E.2d 1035 (1976); *see State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 49 (listing cases). As a general rule, a trial court should therefore make " 'a good faith effort * * * to impanel a jury before * * * grant[ing] a motion for change of venue.' " *State v. Warner*, 55 Ohio St.3d 31, 46, 564 N.E.2d 18 (1990), quoting *State v. Herring*, 21 Ohio App.3d 18, 486 N.E.2d 119 (9th Dist.1984), syllabus.

{¶ 56} That said, the United States Supreme Court has held that in certain rare cases, pretrial publicity is so damaging that prejudice must be conclusively presumed even without a showing of actual bias. *See, e.g., Sheppard*; *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Irvin*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751. To prevail on a claim of presumed prejudice, however, a defendant must make " 'a clear and manifest showing * * * that pretrial publicity was so pervasive and prejudicial that an attempt to seat a jury would be a vain act.' " *Warner* at 46, quoting *Herring* at syllabus; *see Herring* at 18 (citing judicial

economy, convenience, and reducing taxpayer expense as reasons for a trial court to attempt to seat a jury prior to transferring venue to another location).

{¶ 57} We therefore must engage in a two-step analysis of venue in this case, determining first whether the jury was presumptively prejudiced against Mammone and, if not, whether Mammone has established actual juror prejudice. *See Skilling v. United States*, 561 U.S. 358, ___, 130 S.Ct. 2896, 2915, 177 L.Ed.2d 619 (2010); *Campbell v. Bradshaw*, 674 F.3d 578, 593-594 (6th Cir.2012).

*c. Prejudice should not be presumed in this case*

{¶ 58} "A presumption of prejudice" because of adverse press coverage "attends only the extreme case." *Skilling* at 2915; *see also Campbell* at 593, quoting *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir.2007) (prejudice from pretrial publicity " 'is rarely presumed' ").

{¶ 59} The doctrine of presumed prejudice "is the product of three Supreme Court decisions from the 1960's": *Rideau v. Louisiana*, *Estes v. Texas*, and *Sheppard v. Maxwell*. *Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir.2011). The United States Supreme Court most recently applied the doctrine in *Skilling v. United States*, in which the court analyzed four factors before rejecting a claim of presumed prejudice. Namely, the court considered: (1) the size and characteristics of the community in which the crime occurred, (2) whether media coverage about the defendant contained "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight," (3) whether the passage of time lessened media attention, and (4) whether the jury's conduct was inconsistent with a presumption of prejudice. *Id.* at 2915-2916; *see United States v. Warren*, E.D.La. No. 10-154, 2013 WL 1562767 (Apr. 12, 2013). However, *Skilling* did not hold that these four factors are dispositive in every case or indicate that these are the only relevant factors in a presumed-prejudice analysis.

{¶ 60} Here, we find that our analysis is best informed by comparing the facts of this case not to *Skilling*—in which prejudice was not presumed—but to the facts of the cases in which the United States Supreme Court *has* presumed prejudice. Two of these three cases, *Estes* and *Sheppard*, are not particularly instructive because they "involved media interference with courtroom proceedings *during* trial." (Emphasis sic.) *Skilling*, 561 U.S. at ___, 130 S.Ct. at 2915, 177 L.Ed.2d 619, fn.14; *see also Hayes*, 632 F.3d at 508. In *Estes*, "extensive publicity before trial swelled into excessive exposure during preliminary court proceedings" as the media "overran the courtroom" and caused significant disruption. *Skilling* at 2914. In *Sheppard*, "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom." *Sheppard*, 384 U.S. at 355, 86 S.Ct. 1507, 16 L.Ed.2d 600. The United States Supreme Court in *Sheppard* "upset the [defendant's] murder conviction because a 'carnival atmosphere' [had] pervaded the trial." *Skilling* at 2914, quoting *Sheppard* at 358. There is no evidence of such interference here.

{¶ 61} The third case, *Rideau*, is most relevant to our analysis because in that case, the United States Supreme Court presumed prejudice based solely on pretrial publicity. In *Rideau*, the parish sheriff's office had filmed an interrogation of the defendant, during which he confessed to bank robbery, kidnapping, and murder. 373 U.S. at 724, 83 S.Ct. 1417, 10 L.Ed.2d 663. A 20-minute recording of the confession was broadcast three times on television within weeks of Rideau's trial. *Id.* Audiences ranging from 20,000 to 53,000 people viewed the broadcasts, in a total population of approximately 150,000 people. *Id.* Under the circumstances, the United States Supreme Court concluded that "to the tens of thousands of people who saw and heard" Rideau "personally confessing in detail to the crimes," the interrogation "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." (Emphasis sic.) *Id.* at 726. As a result, the court

concluded that the defendant's subsequent trial amounted to a "hollow formality" and it conclusively presumed prejudice. *Id.* at 726-727.

**{¶ 62}** As in *Rideau*, the instant case involves the widespread dissemination of a suspect's supposed confession to crimes. Like the trial court, we believe that "the publication of the [confession] letter on the front page" of the *Repository* "is the thing that's most troublesome" about the pretrial publicity in this case.[1] A "defendant's own confession [is] probably the most probative and damaging evidence that can be admitted against him." *Skilling* at 2916, quoting *Parker v. Randolph*, 442 U.S. 62, 72, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979) (plurality opinion). That said, pretrial publicity about a confession—even one that is inadmissible at trial[2]—"is not in itself sufficient to require a venue transfer." *United States v. Warren*, 2013 WL 1562767 at *5.

**{¶ 63}** Several constitutionally significant factors distinguish the print publication of Mammone's confession from the repeated television broadcasts of Rideau's confession that aired in 1961. First, the manner of publication differed in a crucial way. As the United States Court of Appeals for the Sixth Circuit has explained, "[T]he controlling factor in the [*Rideau*] decision was the fact that the public *viewed* the confession in a televised format." (Emphasis sic.) *DeLisle v. Rivers*, 161 F.3d 370, 384 (6th Cir.1998) (en banc). "[A]ctually seeing and hearing the confession, as one would in a courtroom, would create a certainty of belief that would be difficult for the public to lay aside." *Id.* Here, the public did not *view* Mammone confessing.

---

[1] Mammone's generalized claims about other adverse pretrial publicity and social media are insufficient to trigger a presumption of prejudice. His assertions about extensive media coverage would apply to nearly every homicide case. And he points to no evidence that the social media comments cited "are representative of the hundreds of thousands of individuals who [were] eligible to serve as jurors" in his trial. *United States v. Warren*, 2013 WL 1562767 at *5.

[2] Mammone's confession letter published in the *Repository* was not admitted into evidence at trial. However, the jury during the trial phase did hear a recording of his confession made to police officers on the day of his arrest. The jury also heard a five-hour unsworn statement Mammone made during the mitigation phase of his trial, in which he confessed in great detail.

{¶ 64} Second, the circumstances of publication diverge from *Rideau* in significant ways. In *Rideau*, the defendant's televised confession aired just weeks before the trial began, and roughly one-third of the entire local population viewed the broadcast. Here, Mammone's confession letter was published a single time more than four months before his trial began. And Mammone failed to establish a level of exposure in Stark County similar to the exposure in *Rideau*. The trial court concluded that it was not futile to attempt to seat a jury given "the figures submitted by the *Repository*" about readership, "the population of Stark County," and the considerations that the county has three newspapers and that many county residents subscribe to a fourth newspaper published outside the county. Mammone never supplemented the record or attempted to reargue this point.

{¶ 65} Third, unlike *Rideau*, in which the defendant played no role in the dissemination of his confession, here Mammone himself provided the confession letter to the *Repository*. He therefore is responsible for instigating the single most significant incident of pretrial publicity in his case, which more than anything increased that publicity to a level that he claims should have required the trial court to grant his motion to change venue.

{¶ 66} Finally, although Mammone claims that "[t]he venires were replete with potential jurors who had been extensively prejudiced by media accounts and had formed such strong opinions as to not be able or willing to change their minds," the voir dire transcript reveals otherwise. Prejudice should not be presumed.

{¶ 67} The trial court was very conscious of pretrial publicity in Mammone's case. Each potential juror was asked to complete an extensive publicity questionnaire and the court permitted thorough questioning about publicity issues during small-group voir dire. Dozens of potential jurors stated that they knew nothing about the case. The court instructed the potential jurors during voir dire to disregard all information from outside sources and sought assurances

that every juror would set aside any preexisting opinions and be fair to both sides. The potential jurors were reminded that the media is not always accurate, and they were warned to avoid additional publicity. Most importantly, the trial court excused potential jurors who expressed an inability to set aside preexisting opinions.

{¶ 68} Under these circumstances, we cannot conclude that extensive pretrial publicity rendered Mammone's trial a "hollow formality." *Compare Rideau*, 373 U.S. at 726, 83 S.Ct. 1417, 10 L.Ed.2d 663. As a result, we hold that this is not one of the extraordinary cases in which prejudice should be presumed based solely on the amount and nature of the pretrial publicity alone.

*d. Actual prejudice does not exist in this case*

{¶ 69} Having concluded that prejudice should not be presumed here, we next analyze whether actual prejudice exists. Because Mammone did not raise this objection in the trial court or seek a change of venue at any point after the pretrial venue hearing, we review this claim for plain error. *See State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 61 (reviewing change-of-venue claim for plain error when defendant had waived the argument). We take notice of plain error "with the utmost caution, under exceptional circumstances and only to prevent a miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. To prevail, Mammone must show that an error occurred, that the error was plain, and that but for the error, the outcome of the trial clearly would have been otherwise. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶ 70} Mammone levies several charges of actual bias due to pretrial publicity among members of both the jury pool and the seated jury and argues that the trial court should have ordered a change of venue. For the reasons below, we find no error in this regard, let alone plain error.

**{¶ 71}** First, Mammone argues that he was denied a fair trial because almost every seated juror "had either read, heard, discussed or [seen] an account of the deaths of the Mammone children and their grandmother." But actual bias is not established simply by pointing out some degree of media exposure. *See, e.g., Trimble* at ¶ 63-64; *State v. Maurer*, 15 Ohio St.3d 239, 251, 473 N.E.2d 768 (1984). A juror will be considered unbiased "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723, 81 S.Ct. 1639, 6 L.Ed.2d 751.

**{¶ 72}** Second, Mammone objects that four specific seated jurors—juror Nos. 372, 438, 448, and 461—were biased against him. But juror Nos. 438 and 448 testified that they had not formed *any* opinions about the case before trial. Juror Nos. 372 and 461 admitted that they had formed some preliminary opinions, but they assured the judge that they could set these opinions aside and be fair.

**{¶ 73}** The trial judge is "in the best position to judge each juror's demeanor and fairness" and thus to decide whether to credit a potential juror's assurance that he or she will set aside any prior knowledge and preconceived notions of guilt. *Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 64. One factor in determining whether a trial judge reasonably accepted such assurances is how many other potential jurors admitted a disqualifying prejudice:

> In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations [of impartiality] may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it.

*Murphy v. Florida*, 421 U.S. 794, 803, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Here, there is no evidence of such unwitting influence. For example, in the first small-group voir dire session of 12 potential jurors, only two admitted to a disqualifying prejudice based on pretrial publicity and were excused. Upon careful examination of the record, we defer to the trial court's reasonable conclusion that the four jurors now challenged could be fair and impartial jurors.

{¶ 74} Finally, we are not persuaded by Mammone's vague claim that the entire jury was tainted because those jurors who had been exposed to extensive publicity shared "innumerable opinions about the case" with other jurors. As explained above, Mammone has not established that any of his jurors were actually biased by pretrial publicity. Moreover, he presents no evidence that any juror improperly influenced another juror by stating an inappropriate opinion. Under the circumstances, we reject Mammone's contention as meritless and unsupported by the record.

{¶ 75} For these reasons, we reject proposition of law I.

## 2. Juror Bias in Favor of the Death Penalty

{¶ 76} In his second proposition of law, Mammone argues that two of his trial jurors, juror Nos. 418 and 448, "were unfairly biased in favor of the death penalty" and made it apparent during their responses to questioning during voir dire that they "would automatically vote for the death penalty once they found Mammone guilty of the facts in this case." He asserts that this bias violated his constitutional rights to due process, to receive a fair and reliable sentence, and to be free from cruel and unusual punishment.[3]  *See* the Eighth and Fourteenth

---

[3] Mammone also argues, in a single sentence without citation, that "it was error for the trial court to deny defense counsel's motion for additional peremptory challenges." We summarily reject this argument based on our review of the record. *See State v. Stallings*, 89 Ohio St.3d 280, 288-289, 731 N.E.2d 159 (2000) (summarily rejecting argument that trial court erred by denying motion for 12 peremptory challenges); *State v. Greer*, 39 Ohio St.3d 236, 530 N.E.2d 382 (1988), paragraph two of the syllabus (numerical limit on peremptory challenges is reasonable regulation of right to challenge prospective jurors during voir dire).

Amendments to the U.S. Constitution; Ohio Constitution, Article I, Sections 9, 10, and 16.

**{¶ 77}** The United States Supreme Court and this court have long recognized that a defendant's right to a fair and impartial jury extends to capital sentencing. Accordingly, "[a] prospective juror in a capital case may be excused for cause if [the prospective juror's] views on capital punishment would ' "prevent or substantially impair the performance of [the prospective juror's] duties as a juror in accordance with [the prospective juror's] instructions and * * * oath." ' " *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 38, quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). If a juror would "automatically vote for the death penalty in every case," the juror cannot be fair and impartial because he or she "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require [the juror] to do." *Morgan v. Illinois*, 504 U.S. at 729, 112 S.Ct. 2222, 119 L.Ed.2d 492. "If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Id.*

**{¶ 78}** When a defendant challenges a prospective juror for cause, the trial court's ruling "will not be disturbed on appeal unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion." *State v. Williams*, 79 Ohio St.3d 1, 8, 679 N.E.2d 646 (1997). However, a defendant who does not present a challenge for cause "waive[s] any alleged error in regard to [that] prospective juror." *Jackson* at ¶ 39; *see State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 102. Under those circumstances, plain-error review applies. *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 89-90.

*a. Juror No. 418*

{¶ 79} Mammone argues that juror No. 418 was "unfairly biased in favor of the death penalty" and "could not fairly consider all the possible sentencing options in this case." Mammone did not challenge juror No. 418 for cause, so we review this claim of bias for plain error. *See id.*

{¶ 80} Juror No. 418's views on the death penalty were explored in several ways during voir dire. On her written questionnaire inquiring into her views on capital punishment, juror No. 418 stated her belief "that the punishment should fit the crime" and stated that if a defendant "is found guilty without doubt of taking another person's life, he indeed is not entitled to live out his own life." She indicated that the death penalty is "[g]enerally the proper punishment" for aggravated murder, "with very few exceptions." However, she acknowledged that "there may be circumstances—such as, mental disability—etc." in which it is not appropriate. Ultimately, juror No. 418 expressed her belief "that the death penalty is appropriate in *some* capital murder cases." (Emphasis added.)

{¶ 81} During voir dire, defense counsel questioned juror No. 418 to determine whether she would automatically impose a death sentence if Mammone were convicted. The juror again explained that she generally thinks "punishment should fit the crime," but that she does not firmly believe that every murderer should receive the death penalty. She observed that "sometimes there are circumstances that you need to think about," such as "a mental issue" or "those types of things." In the absence of such circumstances, however, juror No. 418 stated that "it should be an eye for an eye definitely, and especially where there [are] small children involved where it sounds like there was [here]."

{¶ 82} Juror No. 418 never indicated that she would automatically impose the death penalty if Mammone were convicted. Her questionnaire and her verbal responses indicated a general preference for the death penalty for those who commit aggravated murder, but she consistently acknowledged exceptions—both

before and after the trial court explained the two phases of a capital trial and the jury's duty to weigh aggravating circumstances and mitigating factors. *See State v. Stojetz*, 84 Ohio St.3d 452, 460, 705 N.E.2d 329 (1999) (rejecting argument that a juror was an "automatic-death penalty juror" when the juror had "expressed a willingness to take into consideration other factors, such as defendant's background and the nature and circumstances of the crime, before deciding to render a death verdict").

{¶ 83} "[D]eference must be accorded to the trial judge who sees and hears the juror." *Id.* Here, neither the court nor the parties expressed any concern that juror No. 418 was an "automatic death" juror, even as they discussed concerns about other prospective jurors in the same small-group voir dire. Under these circumstances, we defer to the trial judge's decision to seat juror No. 418 and find no error with respect to her service.

*b. Juror No. 448*

{¶ 84} Mammone also argues that juror No. 448 was "unfairly biased in favor of the death penalty" and "could not fairly consider all the possible sentencing options in this case." As with juror No. 418, Mammone did not challenge juror No. 448 for cause, so plain-error review applies. *Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 89-90.

{¶ 85} During larger-group voir dire, the trial judge flagged juror No. 448 as a juror to discuss with counsel. Juror No. 448 had responded to a question from defense counsel by stating, "I think I would have some problem with" being fair given the circumstances of the case. Later, the court and counsel for both sides discussed whether to have this juror return for small-group voir dire. The prosecutor indicated that she "want[ed] the opportunity to explore why" juror No. 448 had "said I can't be fair." The court agreed that juror No. 448 should remain in the jury pool, and the defense made no effort to excuse the juror.

{¶ 86} Juror No. 448 first indicated his attitude toward the death penalty on his written questionnaire asking for his views on that subject. His responses revealed some tension in his thoughts about capital punishment. On the one hand, juror No. 448 wrote that he supported "the state law and right to enforce the death penalty"—which he characterized as a "God-ordained law of the land"—and he indicated agreement with the view that the death penalty is the "proper punishment in all cases where someone is convicted of aggravated murder." On the other hand, he also wrote, "I am not sure due to my religious views if I could give a death penalty verdict."

{¶ 87} During small-group voir dire, the judge and both parties explored this tension. Juror No. 448 assured the judge that even though he had "some religious problems with it," he recognized the state's authority to impose the death penalty and "would want to follow [the court's] orders." He later explained that even though his church "in general leans toward being" pacifistic, he "believes that an eye for an eye is in the Bible."

{¶ 88} During prosecution questioning, juror No. 448 expressed a preference for the death penalty in all cases of aggravated murder. But he later clarified that he could not say for sure whether if there were a conviction he would sentence Mammone to death; he "would have to look at the evidence." The prosecutor explained that mitigating factors "are things that might cause [a juror] to consider a sentence less than death," and juror No. 448 responded that he would follow "the law of the land" and "would consider" such a sentence. The prosecutor again asked, "So you'll follow the Judge's instructions?" The juror said yes. But to defense counsel he again indicated in response to further questioning that if Mammone were convicted of aggravated murder, he "would tend or would vote for capital punishment."

{¶ 89} The judge and the parties did not later specifically analyze juror No. 448's attitudes about the death penalty because neither party challenged him for

cause. However, the trial court did comment on juror No. 448's responses when analyzing a challenge to juror No. 412. The court observed that juror Nos. 412 and 448 had both "given answers which would indicate a natural inclination to lean towards the death penalty." But the court went on to explain that "[s]ometimes in a vacuum it's hard for jurors to articulate how they feel about [the death penalty], and so it comes down to the basics of whether or not they would follow the law fairly, and that's why I pushed them on fairly." The court then denied the challenge to juror No. 412, and there was no further discussion of juror No. 448.

{¶ 90} The trial judge's comments are consistent with this court's past observations regarding the difficulty of having prospective jurors articulate their views on capital punishment during voir dire. Many prospective jurors in a death-penalty case are being asked "to face their views about the death penalty" "for the first time" during voir dire. *Williams*, 79 Ohio St.3d at 6, 679 N.E.2d 646. "[I]t is not uncommon for jurors to express themselves in contradictory and ambiguous ways" in this context, "both due to unfamiliarity with courtroom proceedings and cross-examination tactics and because the jury pool runs the spectrum in terms of education and experience." *White v. Mitchell*, 431 F.3d 517, 537 (6th Cir.2005), citing *Patton v. Yount*, 467 U.S. 1025, 1039, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). Moreover, even when a prospective juror does have "very strongly held views" about the death penalty, he or she likely has "never had to define them within the context of following the law." *Williams* at 6.

{¶ 91} During voir dire, both parties may be "attempting to push a prospective juror into a certain position in order to remove him or her from the jury." *Id.* at 7-8. Accordingly, "it is often necessary for the trial judge to step in and provide some neutral, nonleading instructions and questions in an attempt to determine whether the prospective juror can actually be fair and impartial." *Id.* at 8. It then falls naturally on the "trial judge to sort through [the] responses and determine whether the prospective jurors will be able to follow the law." *Id.* at 6.

{¶ 92} In this case, neither the judge nor the parties ultimately expressed reservations that juror No. 448 was biased in favor of the death penalty. When asked, the juror agreed that he could follow the trial judge's instructions on mitigating factors. The judge was able to "see[] and hear[]" juror No. 448, *Wainwright v. Witt*, 469 U.S. at 426, 105 S.Ct. 844, 83 L.Ed.2d 841, and therefore had "the benefit of observing [the juror's] demeanor and body language." *Williams*, 79 Ohio St.3d at 8, 679 N.E.2d 646. The judge was satisfied that juror No. 448 would follow instructions, and we defer to that judgment. *See Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, at ¶ 40 (no abuse of discretion in denying challenge for cause when "a juror, even one predisposed in favor of imposing death, states that he or she will follow the law and the court's instructions").

{¶ 93} For these reasons, we reject proposition II.

### B. Trial and Mitigation Phase Issues

#### 1. Gruesome Photographs

{¶ 94} Mammone argues in his fifth proposition of law that the trial court violated his constitutional rights by admitting "shocking and gruesome photographs" that were "irrelevant, unnecessary, cumulative, [and] repetitive." Specifically, he challenges the admission of two categories of photos: (1) crime-scene photos of the dead children in their car seats and (2) autopsy photos of the children.[4] According to Mammone, we should order a new trial or vacate his death sentence because these photos deprived him of due process, a fair trial, and a reliable sentencing determination. *See* the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution; Ohio Constitution, Article I, Sections 2, 9, 10, and 16. We reject this contention.

---

[4] Mammone does not challenge any photographs of Margaret Eakin. Even if he had, however, the admission of those photos was proper because their probative value outweighed the danger of unfair prejudice and the photos were not repetitive or cumulative. *See State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768, at paragraph seven of the syllabus.

**{¶ 95}** Under Evid.R. 403(A), a trial court *must* exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Under Evid.R. 403(B), a trial court *may* exclude evidence "if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."

**{¶ 96}** In the context of capital trials, however, we have established "a stricter evidentiary standard" for admitting gruesome photographs and have "strongly caution[ed] judicious use." *State v. Morales*, 32 Ohio St.3d 252, 257-258, 259, 513 N.E.2d 267 (1987), citing *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768, at paragraph seven of the syllabus. A gruesome photograph is admissible only if its "probative value * * * outweigh[s] the danger of prejudice to the defendant." *Morales* at 258. Unlike Evid.R. 403, which turns on whether prejudice *substantially* outweighs probative value, this standard requires "a simple balancing of the relative values" of prejudice and probative value. *Id.* And even if a photo satisfies the balancing test, it can be "neither repetitive nor cumulative in nature." *Id.*; *see State v. Thompson*, 33 Ohio St.3d 1, 9, 514 N.E.2d 407 (1987). A trial court's decision that a photo satisfies this standard is reviewable only for abuse of discretion. *See State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 69; *Morales* at 257; *Maurer* at 264.

*a. Photos of the crime scene*

**{¶ 97}** First, Mammone challenges the introduction of two crime-scene photos, Exhibits 2H and 2I, showing Macy and James dead in their car seats. These photos depict the condition in which police officers found the child victims at the time of Mammone's arrest. Mammone unsuccessfully sought to exclude these photos before trial and again objected to them at trial.

**{¶ 98}** Exhibits 2H and 2I had significant probative value. Each photo "illustrated the testimony of the detectives who described the crime scene," and also was "probative of [the defendant's] intent and the manner and circumstances

29

of the victims' deaths." *Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 134, 136; *see also State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 26; *Morales* at 258. Detectives Weirich and Risner testified that upon arriving at the scene, they found the children dead in the back seat of Mammone's car. Macy and James had been stabbed in the throat while strapped into their car seats, unable to move.

{¶ 99} Mammone nevertheless claims that these photos were "completely unnecessary" because he never denied murdering Macy and James and the state could have proven cause of death "in a less gruesome manner." But we have repeatedly rejected similar arguments in the past. *See Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, at ¶ 70; *Maurer*, 15 Ohio St.3d at 264-265, 473 N.E.2d 768. The state had the burden to prove that Mammone purposely killed the children, and these photos were probative of that issue. *See Maurer* at 265, quoting *State v. Strodes*, 48 Ohio St.2d 113, 116, 357 N.E.2d 375 (1976), *vacated in part on other grounds*, 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978) (" '[t]he state must prove, and the jury must find, that the killing was purposely done' ").

{¶ 100} Under these circumstances, we conclude that the probative value of these two photos outweighed the danger of unfair prejudice to Mammone and that the photos "were neither repetitive nor cumulative in nature." *Morales*, 32 Ohio St.3d at 258, 513 N.E.2d 267. The prosecution selected, and the trial court admitted, a single photo of each child victim from 34 available crime-scene photos showing Mammone's car with the children inside. These two photos were published to the jury only once, although two witnesses authenticated them during their testimony. Accordingly, the trial court did not abuse its discretion by admitting Exhibits 2H and 2I.

*b. Autopsy photos*

{¶ 101} Mammone also challenges the admission of autopsy photos "of very young children." The trial court admitted six autopsy photos of James's injuries, Exhibits 5A-F, and seven of Macy's, Exhibits 6A-G. Defense counsel unsuccessfully sought to exclude these photos both before trial and during the coroner's testimony at trial. But notably, Mammone personally thanked the court during his allocution "for the discretion used in, ah, limiting the, ah, display of autopsy photos for the deceased in this matter."

{¶ 102} Exhibits 5A-F and 6A-G had significant probative value. As mentioned above, the state was required to prove that Mammone purposely killed Macy and James. *See Maurer*, 15 Ohio St.3d at 265, 473 N.E.2d 768. The number and location of the children's injuries and the resulting wounds were all probative evidence of a purpose to cause death. *Id*. In addition, each photo supported and illustrated the coroner's testimony about the wounds inflicted on Macy and James and the cause of their deaths. *Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 148; *Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, at ¶ 26; *Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, at ¶ 72.

{¶ 103} As with the crime-scene photos, Mammone contends that the prejudicial impact of showing the jury gruesome autopsy photos of young children outweighed this probative value. Mammone asserts that the photos were unnecessary because he did not dispute the cause of the children's deaths and because the state could have used testimony alone to prove the children's injuries. But, as explained above, the state bears the burden of proof and it has no obligation to meet that burden in the *least* gruesome way. Consistent with our previous holdings in cases involving children, we conclude that the prejudicial impact of these autopsy photos did not outweigh their probative value. *See*, *e.g*., *Vrabel* at ¶ 69-72; *Trimble* at ¶ 142-145, 155.

{¶ 104} Further, these photos were neither repetitive nor cumulative. At trial, the state offered seven of the more than 100 photographs taken during Macy's autopsy. Each photo presents a different injury. Exhibit 6A depicts Macy as she arrived at the coroner's office, still strapped in her car seat. Exhibits 6B, 6D, and 6E show different knife wounds: (1) three wounds to Macy's left lower face and upper neck, severing her esophagus and trachea, (2) a cluster of three wounds on Macy's left neck, and (3) an exit wound. Exhibits 6C and 6F depict defensive wounds on Macy's right hand and right leg, respectively. Finally, Exhibit 6G shows finger-shaped bruises on Macy's left leg, consistent with someone having a firm grip on that spot.

{¶ 105} Likewise, each of the six autopsy photos of James depicts something different: (1) Exhibit 5B shows a defensive wound on James's right palm, (2) Exhibit 5E depicts a massive stab wound on James's neck, transecting his esophagus and trachea and cutting through to his back, (3) Exhibit 5F depicts the exit wound on James's upper left back, (4) Exhibit 5A captures a close-up of James's hands, (5) Exhibit 5C shows a view of the stab wound on his neck from the other side of his head, and (6) Exhibit 5D shows injuries on his right arm, including the defensive wound on his right hand. Like the autopsy photos of Macy, none of these photos is cumulative or repetitive.

{¶ 106} For these reasons, we find no abuse of discretion in the admission of these autopsy photos.[5] Mammone's fifth proposition of law fails.

---

[5] Even if one or more of these photos had been introduced in error, any such error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 23-24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. Lundgren*, 73 Ohio St.3d 474, 486, 653 N.E.2d 304 (1995). The evidence that Mammone murdered Macy and James was overwhelming: Mammone confessed these crimes to law enforcement in detail, and the jury heard his recorded confession at trial. Further, there is no evidence that these photos improperly affected the jury during the penalty phase. *Compare Thompson*, 33 Ohio St.3d at 14-15, 514 N.E.2d 407 (admission of gruesome photos was harmless error at trial phase, but was not harmless when prosecutor committed misconduct during penalty phase by overzealously appealing to jurors' emotions in urging them to remember those photos when weighing appropriateness of death sentence).

### 2. Prosecutorial Misconduct

{¶ 107} In his fourth and sixth propositions of law, Mammone argues that his due-process rights were violated due to prosecutorial misconduct. *See* the Sixth, Eighth, Ninth, and Fourteenth Amendments to the U.S. Constitution; Ohio Constitution, Article I, Sections 1, 2, 9, 10, 16, and 20. According to Mammone, the prosecution "infest[ed]" the trial phase by introducing irrelevant and "disturbing physical evidence in such a manner that it inflame[d] the jury." And at the sentencing phase, he contends, the prosecutor committed misconduct by questioning a defense expert's failure to write a report and by arguing revenge as an aggravating circumstance.

{¶ 108} A prosecutor is "in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *see State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990) (*Berger*'s comments about prosecutors "apply with equal force to Ohio prosecuting attorneys"). Accordingly, even though a prosecutor "may prosecute with earnestness and vigor" and "may strike hard blows," a prosecutor "is not at liberty to strike foul ones." *Berger* at 88. Prosecutors have a "duty to refrain from improper methods calculated to produce a wrongful conviction." *Id.*

{¶ 109} Because allegations of prosecutorial misconduct implicate due-process concerns, the touchstone of this analysis is the " 'fairness of the trial, not the culpability of the prosecutor.' " *State v. Newton*, 108 Ohio St.3d 13, 2006-Ohio-81, 840 N.E.2d 593, ¶ 92, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). If any misconduct occurred, the court must consider the effect it had on the jury "in the context of the entire trial." *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).

{¶ 110} With regard to each allegation of misconduct, we must determine whether the conduct was "improper, and, if so, whether [it] prejudicially affected

substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "[A] defendant's substantial rights cannot be prejudiced when the remaining evidence, standing alone, is so overwhelming that it constitutes defendant's guilt, and the outcome of the case would have been the same regardless of evidence admitted erroneously." *State v. Hicks*, 194 Ohio App.3d 743, 2011-Ohio-3578, 957 N.E.2d 866, ¶ 30 (8th Dist.2011), citing *State v. Williams*, 38 Ohio St.3d 346, 349-350, 528 N.E.2d 910 (1988).

{¶ 111} If a defendant failed to object to the alleged misconduct below, however, we review the claim for plain error. To prevail on plain-error review, Mammone must establish both that misconduct occurred and that, but for the misconduct, the outcome of the trial clearly would have been otherwise. *State v. Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240; *see* Crim.R. 52(B).

*a. Misconduct during the trial phase*

{¶ 112} Mammone alleges that various incidents of misconduct occurred during the trial phase. First, he argues that the prosecution improperly used certain evidence and other courtroom techniques to pander to the emotions of the jurors. According to Mammone, his trial was already emotionally charged due to pretrial publicity and the circumstances of the murders. Against that backdrop, he maintains that the prosecution took a "histrionic approach" using excessively emotional arguments, courtroom stunts, and irrelevant evidence. But Mammone does not specifically identify any examples of excessively emotional arguments or courtroom stunts. Instead, his brief argues that the prosecution introduced a variety of irrelevant (and repetitive) evidence in a "calculated" effort "to evoke an emotional response from the jury."

{¶ 113} Second, Mammone claims that prosecutorial misconduct occurred when the state offered several additional pieces of "inflammatory" evidence at trial. Mammone argues that this evidence served no legitimate purpose and

"inflamed the jury and unnecessarily reminded the jury of the age and helplessness of the victims" at both stages of the proceedings.

{¶ 114} At bottom, these arguments are evidentiary claims. Accordingly, we must determine whether each piece of challenged evidence was properly admitted. Because "[a] trial court enjoys broad discretion in admitting evidence," "[t]his court will not reject an exercise of this discretion unless it clearly has been abused and the criminal defendant thereby has suffered material prejudice." *State v. Long*, 53 Ohio St.2d at 98, 372 N.E.2d 804.

{¶ 115} Evidence is relevant, and therefore generally admissible under Evid.R. 402, if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. A trial court may exclude relevant evidence if "its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 403(B). Further, a court *must* exclude evidence when its "probative value is substantially outweighed by the danger of unfair prejudice." Evid.R. 403(A). Contrary to Mammone's suggestions, neither the Rules of Evidence nor this court's precedents make "necessity" a prerequisite for admissibility.

{¶ 116} If the evidence was properly admitted, then the prosecutor's decision to offer it cannot form the basis of a misconduct claim.

1) Prosecutorial theatrics

{¶ 117} Mammone objects that the prosecution engaged in inappropriate theatrics by introducing specific evidence during the testimony of four witnesses. For the reasons explained below, this evidence was properly admitted.

{¶ 118} First, Mammone argues that the prosecution introduced a photo of Macy and James, dead in their car seats, during Detective Risner's testimony solely for "shock value." Risner testified regarding his arrest of Mammone on the morning of June 8. While handcuffing Mammone and removing him from his car,

Risner looked through the windows and saw a pistol near Mammone's leg and two dead children strapped in car seats. During Risner's testimony, the state offered a single photograph depicting the back seat of the car at the time of Mammone's arrest. The trial court admitted the photo over a defense objection, explaining that it was "necessary as to what [Risner] observed and [was] not unduly prejudicial given the totality of the testimony."

{¶ 119} Risner's testimony and the photo were admissible because they were probative of Mammone's guilt for the charged offenses. Moreover, as discussed in the analysis of proposition V, the photo satisfies the standard for admitting gruesome photos in capital cases. Accordingly, the trial court did not abuse its discretion by permitting this evidence, and the prosecutor did not engage in misconduct by offering it.

{¶ 120} Second, Mammone argues that the prosecution engaged in "theatrics" by introducing during Detective Weirich's testimony physical evidence that had been in Mammone's car when he was arrested. Weirich collected evidence, took photographs, and processed the crime scenes. At trial, Weirich identified the photos and physical evidence, which was important to establish the chain of custody for several of the state's exhibits. The prosecution introduced items Weirich found in Mammone's car, including weapons, a wedding photo of Marcia, Marcia's dried wedding bouquet, car seats, sippy cups, children's blankets, diapers, sleepers, children's clothing, and diaper/overnight bags. Mammone did not object to Weirich's testimony or these exhibits at trial, but he now claims that the physical evidence had no probative value. Mammone reasons that Risner had already described the scene and the jury had already seen the photo of the children dead in their car seats, so the additional evidence was not probative.

{¶ 121} The trial court did not err by admitting this evidence because it was relevant to proving the offenses charged. This physical evidence supported a finding that Mammone acted with purpose when he committed the three murders;

he planned ahead for the evening, bringing a host of weapons and supplies for the children with him. In addition, the presence of the wedding bouquet and wedding photo confirm that he acted with Marcia in mind, consistent with his admission that he knew the murders would be a major blow to Marcia, in revenge for their destroyed marriage. Weirich's description of the scene and the photograph of the children could not simply replace this physical evidence; instead, they supplemented it.

{¶ 122} But even if any of this evidence had been admitted in error, Mammone cannot show that it was outcome-determinative. *See* Crim.R. 52(B). Mammone gave a full confession to the crimes and, for the most part, did not contest the facts of the murders. He cannot persuasively argue that the exclusion of any, or all, of this physical evidence would have led to a different outcome at his trial.

{¶ 123} Third, Mammone objects to the prosecution's introduction during Dr. Murthy's testimony of several autopsy photos of the children as well as the children's car seats, clothing, and other personal belongings found in Mammone's car. The trial court admitted the autopsy photos over defense objection, but Mammone did not object to the physical evidence at trial. Mammone now argues that all this evidence was irrelevant and lacked probative value.

{¶ 124} This claim fails. The autopsy photos were properly admitted for the reasons explained in our analysis of proposition V. And the physical evidence collected from Mammone's car was admissible to illustrate the nature and circumstances of the crime. The car seats and children's clothing supported Dr. Murthy's testimony about the state of the children's bodies when he received them at the coroner's office. Moreover, even if any of this physical evidence had been improperly admitted, Mammone cannot establish that the error was outcome-determinative.

{¶ 125} Finally, Mammone argues that it was improper for Michael Short to testify about the children's bloody car seats. Mammone did not object to this testimony at trial, but he now claims that the testimony was improper for three reasons: (1) two witnesses had already discussed the car seats, (2) the jury did not need Short's testimony to point out the apparent blood on the car seats, and (3) Short was introduced as a firearms expert.

{¶ 126} Mammone's first two arguments fail for several reasons. First, no other witness testified about the car seats from the perspective of a forensic analyst. Instead, a police officer discussed the car seats when describing his activity at the crime scene, and the coroner discussed the car seats because the children arrived at his office in the seats. Second, the fact that a jury can draw its own conclusions by observing physical evidence does not preclude a witness— particularly a forensic expert—from testifying about his own conclusions drawn from the evidence.

{¶ 127} Mammone also contends that because the court recognized Short as an expert "qualified to render opinions in the area of firearms and fingerprints," Short could not opine about blood on car seats. Short testified that he is a criminalist with responsibility "for either assisting with forensic support or actually going out and responding and processing the major crime scenes in Stark County." He explained that he had examined the car seats for defects such as those consistent with knife slashes and briefly described one of the car seats as "saturated with apparent blood." The trial court arguably defined Short's expertise too narrowly or erred by letting him offer expert testimony about the car seats. And if Mammone had objected during the trial, the court easily could have addressed these concerns. However, Mammone did not object, and he cannot now establish that but for Short's testimony about the car seats, the outcome of his trial would have differed.

**{¶ 128}** For these reasons, the evidence Mammone objected to at trial was properly admitted, and no plain error occurred with regard to evidence that Mammone did not object to at trial. As a result, Mammone's claim that the prosecutor engaged in improper "theatrics" by introducing this evidence likewise fails.

2) Evidence with no probative value

**{¶ 129}** Mammone next argues that misconduct occurred when the prosecutor introduced evidence that allegedly lacked any probative value.

**{¶ 130}** As an initial matter, Mammone urges us to adopt a higher standard for the admission of "highly inflammatory" evidence in capital cases than the Rules of Evidence demand. We have adopted a stricter standard for admitting gruesome photos in capital cases than in other cases, *see Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768, at paragraph seven of the syllabus, and Mammone argues that the same standard should also apply to other "highly inflammatory evidence" in capital cases. But we have never applied this heightened standard outside the context of gruesome images of victims, and we see no reason to do so here. *See State v. Benner*, 40 Ohio St.3d 301, 312, 533 N.E.2d 701 (1988) ("unlike gruesome photographs, testimony alleged to be gruesome should not be subjected to the *Maurer* standard").

**{¶ 131}** First, Mammone objects to "[a]utopsy photos of dead children" and "a photo of dead children in their car seats." These photos were relevant and admissible for the reasons explained in our analysis of proposition V.

**{¶ 132}** Second, Mammone objects to the admission of the children's bloodstained car seats and their belongings found in Mammone's car. This evidence was relevant and admissible because it was probative of Mammone's intent and of the manner and circumstances of the children's deaths. *See State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 65.

{¶ 133} Third, Mammone objects to the admission during the testimony of Marcia and of Richard Hull, of text messages Mammone exchanged with Marcia and Hull on June 7 and 8, 2009. The messages were relevant and admissible because they were indicative of Mammone's intent and conduct throughout the events that occurred on those dates.

{¶ 134} Finally, Mammone challenges the admission of the audio recordings of Marcia's 9-1-1 calls. These recordings were relevant to establish the nature and circumstances of the crimes and to explain the actions of police officers as the events transpired.

{¶ 135} None of this evidence was more prejudicial than probative. Nor was it unduly cumulative or repetitive. Instead, this evidence illustrated the testimony of different state witnesses, each of whom contributed to the prosecution's case against Mammone. And because none of this evidence was erroneously admitted, the prosecution's decision to introduce it did not deprive Mammone of due process or a fair trial.

*b. Misconduct during the mitigation phase*

{¶ 136} Mammone argues in his sixth proposition of law that the prosecutor also committed two instances of misconduct during the mitigation phase, asserting that the prosecutor improperly commented on the fact that Mammone's expert failed to provide a written report and that the prosecutor improperly argued that Mammone's desire for revenge against his ex-wife was an aggravating factor. As explained below, however, the prosecutor's conduct in both regards was well within acceptable bounds.

1) Dr. Smalldon's failure to write a written report

{¶ 137} Mammone objects that the prosecution "repeatedly commented upon Dr. Smalldon's failure to submit a written report" during cross-examination at the mitigation phase.

{¶ 138} Dr. Jeffrey Smalldon is a psychologist who testified as a defense expert during the mitigation phase. On cross-examination, the prosecution questioned Dr. Smalldon about his practices with regard to written reports. Through questioning, the state made clear that Dr. Smalldon usually prepares a written report when he is appointed by the court in child-custody and some other cases. By contrast, here Dr. Smalldon was retained by defense counsel and did not write a report. The prosecutor conveyed to the jury that because there was no written report, he had to contact Dr. Smalldon before trial to get some idea of Dr. Smalldon's likely testimony.

{¶ 139} Mammone argues that this line of questioning amounted to prosecutorial misconduct. In support, he cites *State v. Fears*, 86 Ohio St.3d 329, 715 N.E.2d 136 (1999). In *Fears*, Dr. Smalldon had interviewed the capital defendant in preparation for mitigation. Dr. Smalldon took notes during the interview, and the prosecution sought access to those notes. The trial court ruled that the state could not see the notes, but "[n]evertheless, the prosecutor made several comments about these notes in the presence of the jury." *Id.* at 334. Over objection, the prosecutor asked Dr. Smalldon whether he had provided his notes to the state and alluded to Dr. Smalldon's failure to write a report. During closing argument, the prosecutor argued that "Smalldon's bias was shown by his refusal to give information"—including his notes—"to the state." *Id.* The trial court "sustained several defense objections" during the prosecutor's cross-examination of Dr. Smalldon as well as an objection to the prosecutor's comment about the notes during closing. *Id.* at 334-335. On review, this court concluded that because the trial court had initially overruled the state's request for the notes, the prosecutor "should not have made" the comments he did during closing. *Id.* at 335. However, even then, we did not find that the prosecutor's remarks denied Fears a fair trial. *Id.*

{¶ 140} Mammone maintains that as in *Fears*, the prosecutor here committed misconduct by "implying" that Dr. Smalldon's failure to submit a report "was improper." But unlike *Fears*, the prosecutor's allegedly improper comments occurred during cross-examination, not during closing arguments *after* the trial court had already sustained numerous objections to improper cross-examination on the same issue. In addition, in *Fears* the prosecutor accused Dr. Smalldon of wrongdoing by highlighting his refusal to provide existing materials. By contrast, here the prosecutor simply pointed out Dr. Smalldon's practice of not generating written reports in cases like this one and did not imply that the practice was irregular or unjustifiable. The prosecutor was entitled to cross-examine Dr. Smalldon about all relevant matters affecting bias and credibility, Evid.R. 611(B), and he did not engage in misconduct by doing so.

{¶ 141} Further, even if the prosecutor's comments had been improper, Mammone cannot meet the high standard for plain error. The outcome of the trial would not have differed even if this exchange had not occurred.

2) Revenge as an aggravating circumstance

{¶ 142} Finally, Mammone contends that the prosecutor improperly argued that revenge was an aggravating circumstance during closing arguments at the mitigation phase. Mammone did not raise this objection at trial, so he has waived all but plain error. *See Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, at ¶ 89.

{¶ 143} In Ohio, the second phase of a capital trial has a specific purpose: the jury must determine "whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors" beyond a reasonable doubt. R.C. 2929.03(D)(2). "[T]he 'aggravating circumstances' against which the mitigating evidence is to be weighed *are limited to* the specifications of aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8) that have been alleged in the indictment and proved beyond a reasonable doubt." (Emphasis

added.) *State v. Wogenstahl*, 75 Ohio St.3d 344, 662 N.E.2d 311 (1996), paragraph one of the syllabus. The jury shall consider any evidence relevant to those aggravating circumstances, including evidence about the nature and circumstances of those aggravators. *See* R.C. 2929.03(D)(1); *Wogenstahl* at 353.

{¶ 144} As we have long recognized, a prosecutor's argument during the mitigation phase is restricted to issues germane to the jury's weighing process. The prosecutor may comment on any "testimony or evidence relevant to the nature and circumstances of the aggravating circumstances specified in the indictment of which the defendant was found guilty." *State v. Gumm*, 73 Ohio St.3d 413, 653 N.E.2d 253 (1995), syllabus. However, because the jury is not at liberty to consider nonstatutory aggravating circumstances, the prosecutor cannot argue the existence of nonstatutory aggravating circumstances. *See Wogenstahl* at 355 ("in the penalty phase of a capital murder trial, any use of the term 'aggravating circumstances' must be confined to the statutory aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8)").

{¶ 145} Mammone claims that the prosecutor argued a nonstatutory aggravating factor—revenge—in his mitigation-phase closing argument. During closing, the prosecutor discussed the mitigating factors, then asked the jury, "Now, what are the aggravating circumstances that you have to weigh against those mitigating factors?" The challenged portion of the prosecutor's argument stated:

> On June 8, 2009, [Mammone] trespassed, by force in the Eakin family home with purpose—not out of anger, because you don't drive around the block to see who's there when you're angry, ladies and gentlemen. You go, you're mad, you're upset. You don't care who's there.
>
> But he wanted Margaret alone and as he told police, because that would be a major [blow] to Marcia.

And in his letter to Marcia, My motivation was to hurt you—talking about killing Margaret. My motivation was to hurt you and bring forth the despair one feels when the whole family is taken from them.

The whole family. Goes back to his plan, to his course of conduct.

And his purpose when he went in there was to kill Margaret Eakin, that 57-year old former kindergarten teacher who made the holidays so special for James. And he committed that murder during an aggravated burglary.

And at the same time he committed another aggravating circumstance. Because Margaret was his third victim. She was the third person that this man purposely killed throughout a course of conduct, motivated by the same driving force, to hurt Marcia.

And prior to that he committed this first aggravating circumstance, when as he had planned, he killed his own daughter, Macy, five years old.

She'd only enjoyed five years on this earth and on that day he decided, James Mammone decided, not a jury, that Macy was to die. She was the first victim in his course of conduct that involved the purposeful killing of three people on the sacred ground that he chose.

But he wasn't done yet. No. Because he had also decided that James must die.

James, who would die at his own father's hands, because he thought it was necessary. James would become the second victim. Three-year old James, the second victim in this course of

conduct, again, driven by that similar motivation, the desire to hurt Marcia.

Those are the aggravating circumstances that you must now weigh against the mitigating factors.

And I submit to you, ladies and gentlemen, that this course of conduct was not carried out because of deeply held religious beliefs. This course of conduct was carried out because of * * * [jealousy].

{¶ 146} Contrary to Mammone's claims, the prosecutor did not improperly refer to nonstatutory aggravating circumstances. The jury had convicted Mammone of a course-of-conduct specification, R.C. 2929.04(A)(5), for each of the three murders, meaning that the jury " 'discern[ed] some connection, common scheme, or some pattern or psychological thread' " that tied the offenses together. *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, syllabus, quoting *State v. Cummings*, 332 N.C. 487, 510, 422 S.E.2d 692 (1992). In his closing argument at the mitigation phase, the prosecutor argued the nature and circumstances of Mammone's course-of-conduct specification. Namely, he argued that jealousy and Mammone's desire to hurt Marcia motivated all three murders. The prosecutor did not suggest that the jury could independently consider revenge as an aggravating circumstance.

{¶ 147} Even if any of the prosecutor's comments had been improper, Mammone cannot show prejudice because the trial court correctly instructed the jury on the aggravating circumstances and the proper standard to apply in the weighing process. *See Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, at ¶ 90; *State v. Smith*, 87 Ohio St.3d 424, 444, 721 N.E.2d 93 (2000). It is presumed that the jury followed the court's instructions. *State v. Loza*, 71 Ohio St.3d 61, 79, 641 N.E.2d 1082 (1994). Accordingly, we find no plain error.

*c. Cumulative effect of prosecutorial misconduct*

**{¶ 148}** Finally, Mammone claims that the cumulative effect of "[t]he prosecutor's misconduct, taken together with the presence of jurors biased in favor of the death penalty, and the introduction of irrelevant and inflammatory evidence in the trial phase, so infected Mammone's trial as to result in a deprivation of his rights to due process." This argument lacks merit. *See Cunningham* at ¶ 91; *State v. Landrum*, 53 Ohio St.3d 107, 113, 559 N.E.2d 710 (1990); *Smith* at 444-445. And to the extent that Mammone more broadly invokes the doctrine of cumulative error, that doctrine does not apply because he cannot point to "multiple instances of harmless error." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995).

**{¶ 149}** For all the above reasons, we reject propositions IV and VI.

### 3. Ineffective Assistance of Counsel

**{¶ 150}** In his third proposition of law, Mammone argues that counsel provided constitutionally ineffective assistance throughout the trial. *See* the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution; Ohio Constitution, Article I, Sections 2, 9, 10, and 16. He identifies three instances of allegedly deficient performance with regard to voir dire, presents a sweeping claim about counsel's failure to object to improper exhibits and instances of prosecutorial misconduct, asserts that counsel did not properly investigate and prepare for the mitigation phase, and criticizes counsel for allowing Mammone to make a five-hour unsworn statement in mitigation.

**{¶ 151}** To establish ineffective assistance of counsel, a defendant must both (1) show that counsel's performance "fell below an objective standard of reasonableness," as determined by "prevailing professional norms" and (2) demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). When performing a *Strickland* analysis, courts "must indulge a strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

*a. Voir dire*

{¶ 152} Mammone contends that counsel rendered ineffective assistance at voir dire by failing to adequately question potential jurors about possible bias in favor of the death penalty, about exposure to pretrial publicity, and about their ability to understand and consider mitigating factors. He also alleges that counsel were ineffective for not challenging jurors for cause on these grounds.

{¶ 153} When evaluating claims of ineffective assistance at voir dire, this court has "consistently declined to 'second-guess trial strategy decisions' or impose 'hindsight views about how current counsel might have voir dired the jury differently.' " *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 63, quoting *State v. Mason*, 82 Ohio St.3d 144, 157, 694 N.E.2d 932 (1998). Decisions about voir dire are highly subjective and prone to individual attorney strategy because they are often based on intangible factors. *Mundt* at ¶ 64, citing *Miller v. Francis*, 269 F.3d 609, 620 (6th Cir.2001). Accordingly, "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Murphy*, 91 Ohio St.3d 516, 539, 747 N.E.2d 765 (2001).

{¶ 154} First, Mammone argues that counsel did not adequately question or challenge two jurors, juror Nos. 418 and 448, for cause. According to Mammone, these two jurors "clearly indicated during voir dire that they could not fairly consider all the possible sentencing options in this case." But counsel did not provide deficient performance in this regard because, as explained in our analysis of proposition II, these jurors' views on the death penalty *were* extensively probed during voir dire. Neither party, nor the judge, expressed reservations that either juror No. 418 or No. 448 was biased in favor of the death penalty. And even now, Mammone does not identify any questions that counsel *should* have asked during voir dire. Under these circumstances, we find that counsel's decision not to

inquire further was objectively reasonable. In fact, defense counsel could well have made a strategic decision not to challenge either juror for cause. *See State v. Cornwell*, 86 Ohio St.3d 560, 569, 715 N.E.2d 1144 (1999) ("we will not second-guess trial strategy decisions such as those made in voir dire").

{¶ 155} Second, Mammone argues that counsel failed to adequately voir dire and challenge jurors as to pretrial publicity. As discussed in the analysis of proposition I, every potential juror completed a publicity questionnaire and was questioned about exposure to publicity during voir dire. Thus, counsel's failure to ask additional questions was not objectively unreasonable. Moreover, the trial court, which was in the best "position to judge each juror's demeanor and fairness," concluded that every juror and alternate selected—including the four Mammone specifically expresses concern about—could be fair and impartial. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 64. Accordingly, counsel's performance was not deficient in this regard.

{¶ 156} Finally, Mammone argues that counsel's performance was deficient in failing "to voir dire jurors as to their ability to consider mitigating factors." The record indicates that the prosecutor thoroughly explained mitigation to the jurors and questioned them about whether they would be able to balance the aggravating circumstances against mitigating factors. Defense counsel then posed additional questions about possible mitigating factors, and the trial court itself inquired further when necessary. The fact that defense counsel did not decide to ask additional questions or to press every single potential juror on this issue—or to inquire about specific mitigating factors—is reasonable as a matter of strategy. *See Murphy*, 91 Ohio St.3d at 539, 747 N.E.2d 765.

{¶ 157} Even if counsel's performance at voir dire had been deficient in one or more of these ways, Mammone cannot establish prejudice under *Strickland*. He has failed to establish a reasonable probability that but for counsel's allegedly deficient performance at voir dire, the result of the trial would have been different.

*See, e.g., State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, at ¶ 67.

{¶ 158} For these reasons, we find that counsel did not render ineffective assistance during voir dire.

*b. Failure to object*

{¶ 159} In conjunction with propositions IV and VI, Mammone argues that counsel provided ineffective assistance by failing to object to allegedly improper exhibits and instances of prosecutorial misconduct. As explained above, we reject Mammone's evidentiary claims and allegations of prosecutorial misconduct. Accordingly, he cannot establish ineffective assistance in this regard.

*c. Mitigation investigation and preparation*

{¶ 160} Mammone contends that counsel also provided ineffective assistance during the second phase of his trial by failing to properly interview and prepare the defense's mitigation witnesses. Mammone asserts that information harmful to his mitigation defense emerged during the prosecutor's cross-examination of his mother, Gilise Mammone, and during the direct testimony of his father, James Mammone Jr.

{¶ 161} On direct examination, Gilise testified that Mammone regretted his actions and knew that what he did was wrong. But on cross-examination, she did not effectively dispute the prosecutor's allegation that Mammone continued to maintain that he had no regrets. She also did not dispute that Mammone had told her that Marcia "got exactly what she was told she would get," and she conceded that "[f]rom what he tells me, he's warned her and warned her about it."

{¶ 162} Mammone argues that the jury would not have heard this harmful testimony if counsel had fully interviewed Gilise before the hearing and better prepared her to testify. But there is no evidence that counsel did not fully interview Gilise or adequately prepare her. To establish that "would require proof outside the record," and such a claim "is not appropriately considered on a direct

appeal." *State v. Madrigal*, 87 Ohio St.3d 378, 391, 721 N.E.2d 52 (2000). Further, Mammone's counsel may have been aware of potential pitfalls in Gilise's testimony but nevertheless still made a reasonable strategic decision to put her on the stand. *See State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, at ¶ 115 (counsel's decision to call a witness "reflected reasonable trial strategy"). Gilise had valuable information to offer the jury about Mammone's childhood and history of abuse, and counsel may have decided that the information was more important than avoiding potentially unfavorable testimony on cross-examination. Therefore, Mammone cannot show that counsel were deficient in this regard.

{¶ 163} Further, Mammone cannot show a reasonable likelihood that but for counsel's alleged error, he would not have been sentenced to death. Mammone argues that Gilise conveyed two facts to the jury: (1) that Mammone felt that Marcia got what she deserved and did not regret the murders of the children and (2) that Mammone had repeatedly warned Marcia that there would be grave consequences for her actions. But Mammone's unsworn statement and Dr. Smalldon's testimony conveyed essentially the same information to the jury. Gilise's testimony in this regard was merely cumulative and does not provide a sufficient basis for establishing prejudice.

{¶ 164} Mammone similarly argues that counsel's mitigation investigation and preparation of his father, James Jr., was deficient because his father's testimony directly contradicted the defense's narrative about Mammone's difficult childhood and relationship with his father. James Jr. testified that he had a good relationship with Mammone when he was a child and denied abusing him or calling him names (at least often). He also made what Mammone characterizes as "bizarre and unfocused comments," which Mammone argues detracted from his mitigation case.

50

{¶ 165} As with Gilise, Mammone cannot establish that counsel were deficient in preparing James Jr. to testify or that counsel were deficient in allowing him to testify at all. First, there is no evidence that counsel did not fully interview James Jr. or prepare him to testify. Second, counsel may have reasonably decided to put James Jr. on the stand in spite of some apparent contradictions between his testimony and the defense's mitigation theory. *See Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, at ¶ 115. James Jr. denied abusing Mammone, but he also candidly admitted that he drank frequently and that he recalled striking Gilise a few times. He also admitted that he regularly blacked out in those days, so that there was much he did not remember about this time period. In light of these statements, defense counsel could reasonably have decided that James Jr.'s testimony would do more good than harm.

{¶ 166} Even if counsel's preparation of James Jr. had been somehow deficient, however, Mammone cannot establish that but for this error, there is a reasonable likelihood that he would have received a life sentence. Much of James Jr.'s testimony was consistent with Mammone's mitigation theory and when it was inconsistent, Mammone had three witnesses to support his version of events—his mother, Dr. Smalldon, and himself.

{¶ 167} In sum, Mammone cannot establish that counsel provided ineffective assistance by failing to adequately interview his mitigation witnesses or prepare them for the mitigation hearing.

*d. Mammone's unsworn statement*

{¶ 168} Mammone argues that counsel provided ineffective assistance by failing to prepare him for mitigation, by allowing him to make a five-hour unsworn statement, and by failing to limit or guide his statement in any way.

{¶ 169} At his mitigation hearing, Mammone presented a lengthy unsworn statement—spanning more than 250 pages in the transcript—that described his upbringing, his relationships with Marcia and his children, the events leading up to

June 7 and 8, 2009, and the murders themselves. He began by stating that his intent was to give the jury "a firsthand account of what I did and how I was feeling and thinking at the time." He concluded by saying that he is full of regrets and expressing hope that others will learn from this tragedy by renewing their commitments to God, their marriage, and their children. Ultimately, the court directed Mammone to "[w]rap it up," and he responded by stating, "I've said my piece, Judge."

{¶ 170} Mammone cannot establish that counsel were ineffective by allowing him to make this long unsworn statement. Mammone, "*not counsel*, had the choice whether to testify or give an unsworn statement." (Emphasis added.) *State v. Brooks*, 75 Ohio St.3d 148, 157, 661 N.E.2d 1030 (1996). And regardless, "the decision to give an unsworn statement is a tactical one, a call best made by those at the trial who can judge the tenor of the trial and the mood of the jury." *Id.*

{¶ 171} Mammone's statement was well-spoken, coherent, and organized. For the most part, the statement amplified the confession Mammone had made to police officers the day he was arrested and gave the jury an opportunity to observe his personality and learn more about his background. Moreover, because the court permitted Dr. Smalldon to observe the statement, Dr. Smalldon was able to refer to it during his own testimony. Under the circumstances, to the extent that trial counsel may have influenced Mammone's decision to give an unsworn statement, allowing the statement was objectively reasonable as a matter of strategy. *See State v. Jalowiec*, 91 Ohio St.3d 220, 237, 744 N.E.2d 163 (2001).

{¶ 172} Moreover, even if counsel had somehow performed deficiently with regard to Mammone's unsworn statement, this conduct was not prejudicial. Mammone speculates that the statement was harmful because it was long, cold, and detached and because the jury had no context for connecting it to Mammone's mental illness. But Mammone cannot establish a reasonable likelihood that he would have been sentenced to life imprisonment if not for this statement. For the

most part, Mammone's statement amplified his confession statement to police officers, which was played for the jury at trial.

*e. Cumulative errors*

{¶ 173} Finally, Mammone argues that trial counsel's cumulative errors and omissions violated his constitutional rights. However, because none of Mammone's individual claims of ineffective assistance has merit, he cannot establish an entitlement to relief simply by joining those claims together.

{¶ 174} For all these reasons, we deny Mammone's ineffective-assistance claims and reject his third proposition of law.

## C. Challenges to the Death Penalty

### 1. Cruel and Unusual Punishment

{¶ 175} In his eighth proposition of law, Mammone argues that his death sentence violates the Eighth and Fourteenth Amendments because he is "seriously mentally ill." We reject this claim because the Eighth Amendment does not bar the execution of the seriously mentally ill and, in any event, Mammone has not shown that he suffers from a "serious mental illness."

{¶ 176} As interpreted by the United States Supreme Court, the Eighth Amendment's prohibition on "cruel and unusual punishments" requires that the "punishment for crime * * * be graduated and proportioned to [the] offense." *Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910). As "the most severe punishment," the death penalty is "reserved for a narrow category of crimes and offenders." *Roper v. Simmons*, 543 U.S. 551, 568, 569, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). Accordingly, the United States Supreme Court has identified three categories of offenders who cannot be sentenced to death consistent with the Eighth Amendment: juveniles, the insane, and the mentally retarded. *Id.* at 578, (abrogating *Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989)); *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.E.2d 335 (1986); *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153

L.Ed.2d 335 (2002) (abrogating *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.E.2d 256 (1989)).

{¶ 177} Mammone does not (and does not claim to) fit any of these categories. Instead, he urges this court to extend the Eighth Amendment's protections to a fourth category of offenders: defendants with severe mental illness. Mammone in effect argues that the Eighth Amendment protections can change over time because the amendment "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (Warren, C.J., plurality opinion). In light of present "standards of decency," Mammone would have us hold that the Eighth Amendment bars capital punishment for offenders with serious mental problems.

{¶ 178} Mammone cites two concurring opinions in support of his argument. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 343-367 (Lundberg Stratton, J., concurring); *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 210-250 (Lundberg Stratton, J., concurring). But these opinions do not support Mammone's claim of an Eighth Amendment violation. Instead, they speak to policy matters. Justice Lundberg Stratton did not interpret the Eighth Amendment to bar the execution of the severely mentally ill. She noted that " 'mental illnesses vary widely in severity' " and that " '[t]he General Assembly would be the proper body to * * * take public testimony, hear from experts in the field, and fashion criteria for the judicial system to apply.' " *Lang* at ¶ 365 (Lundberg Stratton, J., concurring), quoting *Ketterer* at ¶ 248 (Lundberg Stratton, J., concurring).

{¶ 179} Neither the United States Supreme Court nor any other court has ever recognized the seriously mentally ill as a category of offenders who cannot be constitutionally executed. *See State v. Dunlap*, 155 Idaho 345, ___, 313 P.3d 1, 35 (2013) ("It appears that every court that has considered this issue [has] refused to

extend *Atkins* and hold that the Eighth Amendment categorically prohibits execution of the mentally ill"). Likewise, we have repeatedly rejected claims that executing a severely mentally ill person constitutes cruel and unusual punishment. *See, e.g., Ketterer* at ¶ 176; *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 155 ("We have found no court that has held that it violates the Eighth Amendment to impose a death sentence on a defendant who was severely mentally ill at the time of the offense" [footnote omitted]).

{¶ 180} In addition, there is tremendous variation in the types and degrees of mental illness. *See Hancock* at ¶ 157 ("Mental illnesses come in many forms; different illnesses may affect a defendant's moral responsibility or deterrability in different ways and to different degrees"). It is therefore fitting that Ohio's sentencing statutes permit consideration of mental illness on a case-by-case basis. Evidence of mental illness is relevant during sentencing under R.C. 2929.04(B)(3) and (B)(7), thereby allowing for "the individualized balanc[ing] between aggravation and mitigation in a specific case." *Id.* at ¶ 158. Here, defense counsel presented evidence about Mammone's mental illness in mitigation, and the jury and trial court weighed that information when determining his sentence. We will again weigh that evidence during our independent sentence evaluation.

{¶ 181} Even if we had some inclination to interpret the Eighth Amendment more broadly, we are unconvinced that Mammone has a "serious mental illness." Dr. Smalldon testified that Mammone has a personality disorder (not otherwise specified) with schizotypal, borderline, and narcissistic features. He further stated that Mammone also has passive-aggressive and compulsive personality traits, as well as some traits that are commonly associated with psychotics. Regardless of how "serious mental illness" is defined, Mammone's mental problems are less severe than those of defendants in other cases in which we have rejected Eighth Amendment challenges. *See, e.g.*, *Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, at ¶ 211 (Lundberg Stratton, J.,

concurring) (noting that the state did not contest the defendant's serious mental illness, including bipolar disorder, substance-abuse problems, and multiple past suicide attempts); *State v. Scott*, 92 Ohio St.3d 1, 2, 748 N.E.2d 11 (2001) (rejecting Eighth Amendment challenge to execution of "any person with a biologically based severe mental illness such as schizophrenia").

**{¶ 182}** For all these reasons, we reject proposition of law VIII.

## 2. Constitutional and International-Law Challenges

**{¶ 183}** In his ninth proposition of law, Mammone presents seven often raised—and always rejected—constitutional challenges to Ohio's capital-punishment scheme. He also argues that Ohio's death-penalty statutes violate international law and treaties and therefore offend the Supremacy Clause of the United States Constitution.

**{¶ 184}** The court has previously considered and rejected each of these claims:

- Ohio's death-penalty scheme is not imposed in an arbitrary and discriminatory manner. *State v. Ferguson*, 108 Ohio St.3d 451, 2006-Ohio-1502, 844 N.E.2d 806, ¶ 86 (rejecting claims of arbitrary and unequal punishment); *State v. Jenkins*, 15 Ohio St.3d 164, 169-170, 473 N.E.2d 264 (1984) (rejecting arguments regarding prosecutorial discretion); *State v. Steffen*, 31 Ohio St.3d 111, 124-125, 509 N.E.2d 383 (1987) (rejecting assertions of racial discrimination).
- Ohio's statutory weighing scheme is neither unconstitutionally vague nor arbitrary and capricious. *Jenkins* at 171-173.
- Ohio does not unconstitutionally burden a capital defendant's right to trial by jury. *Ferguson* at ¶ 89; *State v. Buell*, 22 Ohio St.3d 124, 138, 489 N.E.2d 795 (1986).

- Ohio's requirement that a defendant must submit to the jury any presentence investigation report or mental evaluation he requests is constitutional. *Ferguson* at ¶ 90; *Buell* at 138.

- Ohio's felony-murder specification is constitutional when applied to aggravated murder under R.C. 2903.01(B). *Jenkins* at 177-178.

- R.C. 2929.03(D)(1) and 2929.04(B) are not unconstitutionally vague. *Ferguson* at ¶ 92; *State v. McNeill*, 83 Ohio St.3d 438, 453, 700 N.E.2d 596 (1998).

- Ohio's review of sentence proportionality and appropriateness is constitutional. *Steffen* at paragraph one of the syllabus; *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 207.

- Ohio's death-penalty scheme does not violate international law. *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 137-138; *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 127; *State v. Issa*, 93 Ohio St.3d 49, 69, 752 N.E.2d 904 (2001); *State v. Bey*, 85 Ohio St.3d 487, 502, 709 N.E.2d 484 (1999).

{¶ 185} In light of the above precedent, we reject Mammone's various claims. *See, e.g., State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 215-216; *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 381-383; *State v. Carter*, 89 Ohio St.3d 593, 607-608, 734 N.E.2d 345 (2000).

{¶ 186} As we have previously stated, "Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly effective October 19, 1981, and in the context of the arguments raised herein, does not violate the Eighth and Fourteenth Amendments to the United States Constitution or

any provision of the Ohio Constitution." *Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264, at paragraph one of the syllabus. In addition, we have "rejected the argument that Ohio's death penalty statutes are in violation of treaties to which the United States is a signatory" and thus have held that the statutes do not offend the Supremacy Clause of the United States Constitution. *Bey*, 85 Ohio St.3d at 502, 709 N.E.2d 484.

{¶ 187} Mammone's ninth proposition of law is not well-taken.

## III. INDEPENDENT SENTENCE EVALUATION

{¶ 188} Finally, Mammone argues in his seventh proposition of law that his death sentences were unreliable and inappropriate. This claim invokes R.C. 2929.05(A), which requires us to review Mammone's death sentences for appropriateness and proportionality. In conducting this review, we must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether Mammone's death sentence is proportionate to those affirmed in similar cases. *Id.*

### A. Aggravating Circumstances

{¶ 189} Mammone was convicted of two death specifications for each count of aggravated murder. The jury found that Mammone killed all three victims as "part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender." R.C. 2929.04(A)(5). With respect to Macy and James, the jury also found a violation of R.C. 2929.04(A)(9), murdering a child under the age of 13. And with respect to Margaret, the jury found that the murder occurred during an aggravated burglary, in violation of R.C. 2929.04(A)(7). The evidence at trial supports the jury's finding of all these aggravating circumstances.

{¶ 190} First, the murders of Margaret, Macy, and James were purposeful and part of a single continuing course of conduct. The attacks were linked in time

and motive. *See State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, at syllabus and ¶ 52 (factors such as time, location, a common scheme, or a common psychological thread can establish the factual link necessary to prove a course of conduct). In addition, Mammone's conduct was purposeful. He contemplated violent revenge for months. On June 7, 2009, he packed a bag of weapons and loaded Macy and James into his car. After driving around for hours, Mammone parked and stabbed his children as they sat strapped in their car seats. He then drove to Margaret's house, where he beat her and fatally shot her twice. Hours later, Mammone confessed to all three murders and agreed that they were all motivated, at least in part, by his desire to hurt Marcia. This evidence supports Mammone's conviction under R.C. 2929.04(A)(5) with respect to each of the three counts of aggravated murder.

{¶ 191} Second, Mammone murdered children under the age of 13 when he killed Macy and James. Before trial, Mammone stipulated that his children were five and three years old at the time of their deaths. Accordingly, the evidence supports Mammone's conviction under R.C. 2929.04(A)(9) for two of the three counts of aggravated murder.

{¶ 192} Finally, the evidence shows that Mammone murdered Margaret during an aggravated burglary. R.C. 2911.11(A) defines aggravated burglary as follows:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * *, when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

Mammone committed aggravated burglary when he entered the Eakins' occupied home, with the intent to harm Margaret, while carrying a deadly weapon. Mammone located Margaret, then shot and beat her, causing her death. There is no question that Mammone was the principal offender in this murder; nothing suggests that any other offender was involved. Accordingly, the evidence supports the jury's finding of felony murder. *See* R.C. 2929.04(A)(7).

## B. Mitigating Factors

{¶ 193} For each murder count, we must weigh the applicable aggravating circumstances against any mitigating evidence about the "nature and circumstances of the offense" and Mammone's "history, character, and background." R.C. 2929.04(B). In addition, we consider the statutory mitigating factors set forth in the subsections of R.C. 2929.04(B): (B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth of the offender), (B)(5) (lack of a significant criminal record), (B)(6) (accomplice rather than principal offender), and (B)(7) (any other relevant factors).

{¶ 194} At the mitigation hearing, the defense presented Mammone's unsworn statement, testimony from his parents, and testimony from defense expert psychologist Dr. Jeffrey Smalldon.

### 1. Mammone's Unsworn Statement

{¶ 195} In his unsworn statement, Mammone told the jury about his background, described the events leading up to June 7 and 8, 2009, and gave "a firsthand account of what I did and how I was feeling and thinking at the time" of the murders.

{¶ 196} Mammone was born in Canton in 1973 and lived in that area most of his life. When Mammone was a child, his father drank excessively and regularly beat his wife and son severely. By the time Mammone was five or six years old, he was "horrified to go home."

{¶ 197} Mammone's parents divorced when he was ten years old and his father, James Jr., moved back in with his own parents. Mammone's mother, Gilise, struggled financially and became depressed. Mammone, who had always been a strong student, lost interest in school and also became depressed. In 1986, Gilise began to date a neighbor, and she and her son eventually moved in with the neighbor. Mammone was extremely jealous and believed that his mother was being mentally controlled. He began to spend more time at his paternal grandparents' house. His relationship with his father improved and he became very close to his grandfather, who had always treated Mammone like a son. One of Mammone's grandmothers took him to church with her and taught him strong values. Around this time, Mammone began to develop "a complex" about how his family wasn't the way that he "thought families should be." As a teenager, Mammone had several close friends. He began working at age 16 and held a steady succession of jobs. At age 18, Mammone left home and lived with a friend for a short time before moving in with his paternal grandparents. He also met Richard Hull, and the two quickly became inseparable.

{¶ 198} Mammone and Marcia met while working at a restaurant, and they began dating in February 1996. They shared the same views about commitment and God. Mammone respected Marcia's family and he began attending church with them. The couple married in December 1998. At some point, Marcia mentioned that she could imagine leaving Mammone if he were to make a certain kind of financial mistake with their money. This comment shocked Mammone, and he became insecure about the marriage. He questioned whether they should have children, because he believed that children should be raised only in a home

with both parents present as husband and wife. Marcia assuaged Mammone's fears and reiterated her commitment to him.

{¶ 199} Macy was born on March 22, 2004, and James IV was born on May 5, 2006. Marcia was overwhelmed after Macy's birth and even more overwhelmed after James was born. She started seeing a psychologist, but Mammone rejected the idea of joint marriage counseling. Eventually he agreed to see a psychological counselor on his own, but his counseling was not helpful and his relationship with Marcia deteriorated.

{¶ 200} In spring 2007, Marcia got drunk at a party and informed her work colleagues that Mammone did not want Macy and James to be around them because many of them "had been divorced and had children who were being raised in broken homes." This statement was true: Mammone did not "want [his] children in that environment." However, he had great difficulty explaining his views to Marcia's coworkers, some of whom he regarded as friends. Marcia felt more and more isolated and believed that Mammone was too judgmental.

{¶ 201} On August 3, 2007, Marcia announced that she was leaving Mammone. Mammone reminded her that he would never let the children be raised in a home without both parents living together. Marcia told him that she already felt like a single mother and that she would rather just be one. Mammone refused to let Marcia leave the house. He blocked the door and crushed her phone. By the end of the day, Mammone agreed to enter marriage counseling and the couple committed to making the marriage work.

{¶ 202} Mammone experienced a nervous breakdown. He quit his job and did not feel like leaving the house for several months.

{¶ 203} In December 2007, Mammone got drunk at a Cleveland Browns game. He became very upset with Marcia and warned her, "If you try to leave me, you know, I'll kill you and I'll kill the kids." He assured her that he would "send the children back to heaven to be with God" because, as he had previously told her,

he "would absolutely see [them] dead before I would see them go through what I know to be the tragedies of a broken home."  Unbeknownst to Mammone at the time, Marcia contacted a lawyer soon after the Browns game.  She also secretly started setting money aside.

{¶ 204} One morning in summer 2008, Mammone saw Marcia decline a phone call.  He took Marcia's phone, called the number on it, and was connected to a lawyer's office.  Marcia then told Mammone that she was leaving him.  Mammone threatened Marcia, but he did not really intend to hurt her.  Later that day, Marcia was driving the family to the Eakins' house when they passed a police officer.  Marcia yelled for help and Mammone was arrested.  He was charged with verbal domestic violence and briefly jailed for threatening to kill Marcia.  By the time Mammone was released, Marcia and the children had left on a trip to New York.  Marcia later got a protection order and Mammone attended court-ordered domestic-violence therapy.  After his arrest, Mammone experienced another nervous breakdown.  He felt shocked, depressed, betrayed, and abandoned.  Mammone assembled a shrine to Marcia in the living room of the house that they had formerly shared, with items such as her wedding photo and bridal bouquet.

{¶ 205} Mammone "couldn't stop thinking about violent means" of revenge.  He bought a pickax, a machete-like tool, and a shovel handle at a farming supply store.  He then sat in front of his living room shrine and drove long nails through the shovel handle to create a weapon.  Throughout the summer, Mammone spoke to various people—including Richard Hull, another friend, and his lawyer—about his desire to kill Marcia, but he did not mention anything about killing his children.

{¶ 206} Mammone tried to keep tabs on Marcia and the children throughout the summer.  When he questioned Marcia about her social life, she told him to mind his own business.  In response, Mammone once unsuccessfully tried to enter the Eakins' house with a baseball bat.

{¶ 207} Mammone eventually got supervised visitation with Macy and James and, later, overnight visitation. But Mammone only became more upset and frustrated about the situation and his thoughts grew increasingly violent.

{¶ 208} On June 7, 2009, Mammone picked up Macy and James at the Eakins' house for an overnight visit. He and the children drove by Marcia's apartment and saw a truck in the driveway. When they drove by again, the truck was gone, so Mammone went looking for it.

{¶ 209} Mammone began to text Marcia and became increasingly angry with her responses. Back at his apartment, Mammone filled a blue bag with the contents of a kitchen drawer, including tongs and a meat shears. He eventually also collected two knives, a handgun, a large wedding photo of Marcia, and Marcia's wedding bouquet. Mammone took a valium and drank half a bottle of wine. According to Mammone, "[A]t this point in time I had concluded that * * * that night I was going to kill the children." He took all the supplies, loaded the children into his Oldsmobile, and began driving around.

{¶ 210} Mammone continued to text Marcia. Around 3:30 a.m. on June 8, he decided to burn the truck that was parked in Marcia's driveway and went to his apartment for additional supplies.

{¶ 211} Later, Mammone parked at the church. He pulled out a knife and plunged it into Macy's neck three or four times as she slept. He simultaneously severed Macy's jugular vein and brain stem because he wanted to kill her instantly. Mammone cut James at a different angle. Then he got back in the car, said a prayer, and started driving again.

{¶ 212} At a stop sign, Mammone looked back at his children and felt a surge of aggression that caused him to contemplate killing his wife's parents. He drove to the Eakins' house, grabbed the pistol, and cocked the hammer. Mammone ran upstairs and found Margaret lying on the bed in the guest bedroom. He shot her right shoulder. The gun jammed, so Mammone hit Margaret's face

with the gun and a lamp. Mammone unjammed the gun and shot Margaret again, in the face.

{¶ 213} Next, Mammone drove to Marcia's apartment. He doused the truck that was parked there with gasoline, but his lighter fell apart. Mammone smashed in Marcia's back door and entered the apartment. Eventually, he left the apartment and threw a bat at Marcia's window before deciding to drive away.

{¶ 214} Mammone drove back to the church, where he called his mother and confessed that he had committed the three murders. He drove around for a time, took a dozen pills, and drank some wine. He left three voice mails for Hull. But—contrary to what Mammone said in one message to Hull—he had not actually decided a year earlier that what he had done would be the best way to get revenge on Marcia.

{¶ 215} Mammone knew the detectives who interviewed him after his arrest. He felt comfortable with them and wanted to talk about what had happened. According to Mammone, he has plenty of regrets now. But he hopes that his children's deaths will encourage others to be fully committed to their marriages and their families.

### 2. Testimony of James Mammone Jr.

{¶ 216} Mammone's father, James Jr., testified that he married Gilise in 1973, three months before Mammone's birth. The couple divorced when Mammone was ten, and James Jr. moved back to his parents' house.

{¶ 217} James Jr. has been antisocial for about 15 years. He was unemployed at the time of the trial and prefers to be by himself. Although he lived only ten minutes away from Mammone for many years, they had not spoken since before Macy was born. Mammone stopped seeing James Jr. after James Jr. refused to come to the hospital when Macy was born.

{¶ 218} James Jr. believed that he had a close relationship with Mammone when he was a child. He admitted to calling his son a "maggot," but he does not

recall using this nickname often or in a particularly derogatory way or calling Mammone stupid. James Jr. was sad to hear that Mammone and his mother thought he was abusive, though he did recall striking his wife at least once or twice while Mammone was present. He testified that there is a lot that he does not remember, however, because at that time of his life he drank five to nine beers most nights and regularly blacked out.

{¶ 219} James Jr. stated that when he was a child, his own father "was a major drunk" who regularly passed out at the steering wheel of his car. But James Jr. acknowledged that Mammone had a very good relationship with James Jr.'s father.

### 3. Testimony of Gilise Mammone

{¶ 220} Gilise and James Jr. married in 1973 and divorced in 1984, when Mammone was ten years old. Gilise entered another relationship about four years later and had been with the same man for 22 years by the time of Mammone's trial. Gilise testified that James Jr. was a "pretty bad drinker" who mentally and physically abused her and Mammone. James Jr. called Gilise names and found it amusing to call Mammone a "maggot." He beat Gilise (sometimes making Mammone watch) and physically harmed Mammone.

{¶ 221} Although Mammone's relationship with his father was poor, he had a good relationship with his grandparents, especially his paternal grandfather and maternal grandmother. He was much closer to Gilise than to James Jr. As an only child, Mammone spent a lot of time alone in his room. But Gilise testified that he was a smart child who got along well with other children. He was always with friends and treated them like brothers.

{¶ 222} Gilise did not realize that Mammone and Marcia were having serious marital problems until Mammone was arrested for domestic violence. Marcia had complained that Mammone worked too much, but Gilise thought that her son had a wonderful relationship with Macy and James.

**{¶ 223}** Gilise stated her opinion that Mammone knew that he had done something wrong and regretted it, though he had not expressly told her so. On cross-examination, she explained that Mammone had called her from jail and gave her the impression that he had felt that murder was his only option. She recalls telling Mammone that Marcia had made a costly decision. But she was clear that she did not consider the murders to be Marcia's fault and stated that Mammone was "the only person at fault here."

### 4. Testimony of Dr. Smalldon

**{¶ 224}** Psychologist Jeffrey Smalldon testified about his extensive and wide-ranging psychological evaluation of Mammone. Dr. Smalldon never doubted Mammone's competence to stand trial. He testified that Mammone knew the difference between right and wrong when he committed the murders, but he opined that Mammone was experiencing extreme emotional distress and suffering from a severe mental disorder.

**{¶ 225}** As a child, Mammone was a bright but chronically underachieving student. Mammone and his mother both told Dr. Smalldon that he was abused by his father, but they also related that the abuse ended when the parents divorced when Mammone was age ten. On cross-examination, Dr. Smalldon admitted that he had no independent confirmation of abuse other than Mammone's and Gilise's allegations. Mammone has worked steadily since age 16 except for a few brief periods of time.

**{¶ 226}** Dr. Smalldon described an odd interview that he had conducted with Mammone's father, James Jr., for 40 minutes outside James Jr.'s home on a frigid day during the winter while James Jr. was wearing only shorts. James Jr. had explained that he does not like to be around people and that he rarely leaves the house. Because James Jr. would not come to the hospital to see Macy when she was born, Mammone had not spoken to him in about five years. James Jr.

indicated that he did not "see what the big deal is about children." He denied abusing Mammone.

{¶ 227} Dr. Smalldon opined that Mammone was profoundly affected by his father frequently calling him names like "maggot" and "loser" as a child. Dr. Smalldon explained that certain developmental factors in Mammone's childhood likely played a role in shaping his personality. People interviewed by Dr. Smalldon described Mammone as inward, reclusive, and passive in his relationships with others. But according to Dr. Smalldon, Mammone during the two years preceding the murders experienced tremendous social turmoil.

{¶ 228} Marcia was Mammone's first serious girlfriend. They began dating when Mammone was age 23 and married when he was age 25. Mammone described Marcia in highly idealized terms, such as calling her a moral woman of God. He believed that they were soul mates and that God had blessed their union.

{¶ 229} A few years into the marriage, Marcia mentioned a scenario in which she could imagine leaving the marriage, and it hit Mammone hard. When he later learned that Marcia wanted to see a marriage counselor his insecurity came to the surface. Marcia tried to leave Mammone in August 2007, and from then on, Mammone was beside himself and his anxiety increased. He blew up at a Cleveland Browns game in late 2007 and continued to be in emotional tumult during 2008. Mammone was devastated when Marcia left him. He responded with panic.

{¶ 230} Mammone was always polite and respectful during meetings with Dr. Smalldon. He was "almost disarmingly casual and matter of fact," even when describing his crimes. In fact, Mammone was eager to discuss the circumstances of his crimes and arrest. He repeatedly expressed remorse about Margaret's death, but he never questioned his decision to take Macy's and James's lives. He justified killing the children by saying that he was acting as "an instrument of moral righteousness" and that "it was absolutely the correct thing to do to restore

them to their purity." Mammone told Dr. Smalldon that it would have been unacceptable for them to be brought up in a broken home. According to Dr. Smalldon, Mammone still to this day considers himself to be a devoted father. Dr. Smalldon explained that when Mammone left the voice mail for his friend Richard Hull, he was speaking from the bottom, in a moment of anger and utter despair. Dr. Smalldon opined that he does not think that Mammone was literally stating his motivation for the murders in that voice mail.

{¶ 231} Dr. Smalldon performed cognitive and neuropsychological testing on Mammone. Mammone has a full-scale IQ of 117, indicating above-average intelligence. He always gave his best effort on tests and never tried to convince Dr. Smalldon that he was mentally ill. Dr. Smalldon found no evidence of physical brain impairment.

{¶ 232} Mammone's profile on the Minnesota Multiphasic Personality Inventory (commonly called the MMPI-2) indicated a number of characteristics that are rarely seen in people who are not psychotic. For example, Mammone's thinking was confused and very disordered, he experienced profound personal alienation, he was preoccupied with odd or occult ideas, he spent a great deal of time engaged in fantasies, his thinking was rigid and unwavering, he was preoccupied with persecutory thoughts, and he viewed the world as highly threatening. Nevertheless, Dr. Smalldon stated that he does not believe that Mammone is psychotic.

{¶ 233} Dr. Smalldon diagnosed Mammone with an unspecified personality disorder, with schizotypal, borderline, and narcissistic features. He explained that this is a severe personality disorder. Schizotypal refers to an inner personality that is typically perceived by others as highly idiosyncratic and is often associated with deficits in empathy and with feelings of alienation. Borderline means that Mammone tends to see things in black-and-white terms and has an unstable sense of self. He is likely to be preoccupied with abandonment and prone

to overreact emotionally. Finally, narcissistic means that Mammone acts with a high degree of self-absorption. Dr. Smalldon also identified passive-aggressive and obsessive-compulsive personality traits and concluded that Mammone suffers from generalized anxiety disorder. In addition, Mammone had engaged in episodic alcohol abuse in the past. Dr. Smalldon indicated that these diagnoses are consistent with diagnoses by prior treating mental-health professionals.

{¶ 234} On cross-examination, Dr. Smalldon conceded that Mammone does not have brain damage and that he is not insane, bipolar, delusional, schizophrenic, or an alcoholic. He then confirmed that Mammone had "thought about [murder] almost constantly for about a year," and he indicated that jealousy undoubtedly played a role in motivating Mammone to commit the killings.

### C. Weighing of Aggravating Circumstances and Mitigating Factors

{¶ 235} This court is required to independently determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case. R.C. 2929.05(A). Mammone now urges us to assign weight to the following mitigating factors: (1) his mental state at the time of the murders (R.C. 2929.04(B)(3)), (2) his history and background, (3) his lack of significant criminal history (R.C. 2929.04(B)(5)), and (4) his cooperation with the police investigation and remorse for Margaret's murder (R.C. 2929.04(B)(7)).

{¶ 236} Mammone's mental state is not entitled to any weight under R.C. 2929.04(B)(3). Although Dr. Smalldon testified that Mammone was under extreme emotional distress and was suffering from a severe mental disorder at the time of the murders, there is no evidence that Mammone "lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law" at that time. R.C. 2929.04(B)(3). Dr. Smalldon acknowledged as much, and Mammone's own actions—taking steps to avoid detection such as driving at the speed limit on infrequently patrolled roads— confirmed that he knew that his conduct was criminal. Mammone's mental

70

problems therefore do not qualify as a mitigating factor under R.C. 2929.04(B)(3). All of this evidence is, however, relevant under R.C. 2929.04(B)(7). *See, e.g., State v. Treesh*, 90 Ohio St.3d 460, 492, 739 N.E.2d 749 (2001) (considering evidence of mental problems under R.C. 2929.04(B)(7) when evidence did not satisfy the criteria of R.C. 2929.04(B)(3)); *State v. Fears*, 86 Ohio St.3d at 349, 715 N.E.2d 136.

{¶ 237} Mammone's history and background are entitled to some weight in mitigation. As explained above, Mammone as a child had a strained relationship with his father. There is evidence that James Jr. emotionally abused Mammone and physically abused Mammone and his mother. But Mammone also enjoyed the love and support of his mother and his grandparents (particularly his paternal grandfather) throughout his childhood. We therefore assign slight mitigating weight to the difficult circumstances of Mammone's childhood. *See, e.g., State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 244 (difficult childhood as mitigating factor); *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 103, 108 (same).

{¶ 238} Mammone's lack of a significant criminal record is entitled to minimal weight. Mammone has only one prior criminal conviction, for a fourth-degree misdemeanor. But that conviction was for domestic violence against Marcia, and given that revenge against her was a motivating factor in these purposeful killings, we assign little mitigating weight to Mammone's lack of criminal history. *See State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 207-208 (assigning little weight to criminal-history factor when defendant had a prior misdemeanor conviction for domestic violence against a member of his household).

{¶ 239} Finally, under the catchall mitigation provision, we assign weight to a variety of factors. First, we give moderate weight to Dr. Smalldon's extensive testimony about Mammone's severe personality disorder and his mental state. *See*

*State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 76, 118 (assigning moderate weight to defendant's personality disorders). Second, we give some weight to Mammone's strong work history and his success as a student. *See State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 281 (work history as mitigating factor). Finally, since committing these crimes, Mammone has expressed remorse for Margaret's murder (though not for the murders of Macy and James), cooperated with the police investigation, and adjusted well to incarceration. *See State v. Smith*, 80 Ohio St.3d 89, 121, 684 N.E.2d 668 (1997) (remorse, cooperation, and adjustment to incarceration afforded marginal weight). We assign modest weight to each of these factors.

**{¶ 240}** We conclude that the two aggravating circumstances for each of the three murder counts outweigh the mitigating factors. With respect to Margaret's murder, the course-of-conduct and felony-murder specifications strongly outweigh the mitigating factors. *See State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, at ¶ 163 (rejecting defendant's argument that multiple-murder specification should be afforded "comparatively light weight" in case in which the state had proved two aggravating circumstances—course of conduct and felony murder predicated on aggravated burglary). The two specifications that apply to the murders of Macy and James—course of conduct and child murder—overwhelm the mitigating factors. "In particular, the R.C. 2929.04(A)(9) child-murder specification is entitled to great weight because it involved the murder of a young and vulnerable victim." *State v. Powell,* 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 282. As a result, we conclude that for each of the three murders, the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

## D. Proportionality

**{¶ 241}** Finally, we conclude that the death penalty is appropriate and proportionate here when compared to death sentences approved in similar cases.

We have previously upheld death sentences for a course of conduct under R.C. 2929.04(A)(5). *See, e.g., State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 329; *Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 284; *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, at ¶ 140. We have also upheld the death penalty for other child murders under R.C. 2929.04(A)(9). *See Powell* at ¶ 284; *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 206; *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 119. Finally, we have upheld the death penalty for aggravated murder during an aggravated burglary under R.C. 2929.04(A)(7). *See, e.g., State v. Goff*, 82 Ohio St.3d 123, 143-144, 694 N.E.2d 916 (1998); *State v. Bonnell*, 61 Ohio St.3d 179, 187, 573 N.E.2d 1082 (1991); *State v. Franklin*, 62 Ohio St.3d 118, 129-130, 580 N.E.2d 1 (1991).

## IV. CONCLUSION

{¶ 242} We affirm all judgments of conviction and the sentences of death entered against James Mammone III.

Judgment affirmed.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, KENNEDY, and FRENCH, JJ., concur.

O'NEILL, J., concurs in part and dissents in part.

————————————

**O'NEILL, J., concurring in part and dissenting in part.**

{¶ 243} Once again, a case has come before us that challenges my resolve to stay the course regarding the unconstitutionality of the death penalty in Ohio. It is incomprehensible how someone could murder his own children while they are helplessly strapped into their car seats. Five-year-old Macy and three-year-old James were stabbed in their throats by their father for absolutely no reason other than to make their mother suffer.

{¶ 244} This case comes on the heels of *State v. Kirkland*, ___ Ohio St.3d ___, 2014-Ohio-1966, ___ N.E.3d ___, and *State v. Wogenstahl*, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900, two other capital cases involving atrocious monsters who took the lives of innocent children in gruesome acts of violence.

{¶ 245} There is no doubt that these three murderers should be dealt with in the strongest manner permitted under the Constitution. I agree with the majority in this case that Mammone's convictions must stand. The state proved its case, and it has demonstrated that he is guilty of multiple murders, beyond a reasonable doubt. However, as evil as Mammone is, I still must conclude that life in prison without the possibility of ever being released is the appropriate sentence, for the reasons I offered in my dissent in *Wogenstahl*. *See id*. at ¶ 1-9 (O'Neill, J., dissenting). The death penalty is both cruel and unusual and I refuse to ratify the taking of any human life in the name of retribution, deterrence, or punishment. We as a society live by our Constitutions and by a moral code that clearly is not subscribed to by this defendant. On a moral level, I simply cannot countenance the concept of lowering 11 million Ohioans to Mr. Mammone's level of depravity.

{¶ 246} Accordingly, I concur in affirming the convictions and dissent on the imposition of the death penalty.

_____

John D. Ferrero, Stark County Prosecuting Attorney, and Kathleen O. Tatarsky and Renee M. Watson, Assistant Prosecuting Attorneys, for appellee.

Timothy Young, Ohio Public Defender, and Robert K. Lowe and Shawn P. Welch, Assistant Public Defenders; and Angela Miller, for appellant.

_____